**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NORTH CAROLINA**
**WESTERN DIVISION**

Civil Case No. 5:26-cv-88-BO-KS

| | | |
|---|---|---|
| **BARONIUS PRESS LTD.**<br><br>Plaintiff,<br><br>v.<br><br>**CREATIVE MEDIA PARTNERS, LLC**, a Wyoming limited liability company, and<br><br>**ROBERT HOLT**, an individual, and<br><br>**ANDREW ROSKILL**, an individual, and<br><br>**JASON YOUMANS**, an individual,<br><br>Defendants. | ) | **SECOND AMENDED VERIFIED COMPLAINT** |

Plaintiff Baronius Press Ltd ("**Plaintiff**"), by and through undersigned counsel, hereby alleges upon knowledge as to its own acts and upon information and belief as to all other matters, for its Second Amended Verified Complaint against Defendant Creative Media Partners, LLC ("**CMP**"), Defendant Robert Holt ("**Holt**"), Defendant Andrew Roskill ("**Roskill**"), and Defendant Jason Youmans ("**Youmans**") (collectively, "**Defendants**"), as follows:

## PRELIMINARY STATEMENT

1. This is not an isolated act of infringement. CMP operates an industrial-scale, automated print-on-demand publishing operation that has published, or caused to be published, in excess of 500,000 purported literary works, sourced from pre-existing material, that CMP has digitized and reproduced without meaningful review of copyright status. Fourteen works in which Plaintiff holds or held exclusive rights (collectively, the "**Works**") are among the copyrighted

works processed and sold through that operation, and CMP has reproduced, distributed, and sold each of them without authorization.

2. The Works fall into three categories, and certain Works fall into more than one: (a) original English-language works in which Plaintiff holds the copyright or assigned exclusive rights directly; (b) English-language translations of foreign-language originals in which Plaintiff owns all rights; and (c) works in which Plaintiff held an exclusive license to publish an English-language translation of a foreign-language original, for a defined license period through December 31, 2021.

3. Plaintiff's counsel purchased representative copies of the CMP's editions of the Works, which bore production labels identifying Lightning Source LLC as the manufacturer of the books. Records produced by Ingram Content Group and Lightning Source LLC confirm that CMP distributed and sold at least 628 infringing copies of three of the Works alone between approximately September 2021 and February 2026; upon information and belief, CMP distributed and sold additional copies of the remaining Works through the print-on-demand and wholesale distribution channels described herein, the full extent of which remains subject to discovery.

4. Each infringing edition bears a printed statement representing that the work is in the public domain and free of any copyright, and that no entity, individual or corporate, holds rights in it.

5. Upon information and belief, Defendants caused this same false statement, verbatim, to be transmitted electronically through Defendants' print-on-demand distributor's metadata feed directly into the retail marketplace. This distribution of false copyright management information was not incidental, and was not limited to the physical copies Defendants sold: it occurred independent of, and regardless of, whether any particular retailer purchased a copy.

6. Records produced by Ingram Content Group reflect that at least fifty retailers purchased and offered certain of the Works for sale through this feed; upon information and belief,

the feed itself, and the false copyright management information it carried, reached a substantially larger number of retailers, with respect to those Works and the remaining Works as well. Each such delivery to a receiving retailer was a separate transmission of the false copyright management information. Plaintiff contends that each such transmission constituted a separate violation of 17 U.S.C. § 1202(a). The precise number of retailers that received the feed will be established through discovery.

7. Holt, Roskill, and Youmans, each of whom has spent in excess of two decades in this industry, direct, control, and personally participate in CMP's operation described above, including but not limited to supervisory authority, direct participation, financial benefit and ability to control the infringing conduct, and are personally liable, jointly and severally with CMP, for the infringing conduct alleged herein.

8. Defendants' infringing editions were made available through major retailers and online marketplaces in the United States and internationally.

9. Defendants' conduct has caused substantial harm to Plaintiff, including loss of sales, impairment of Plaintiff's exclusive rights in the Works, diminution in the value of those rights, and unjust enrichment to Defendants, and entitles Plaintiff to relief under the Copyright Act and the DMCA.

10. Plaintiff alleges violations of the United States Copyright Act, 17 U.S.C. § 101 et seq. (the "**Copyright Act**"), and the Digital Millennium Copyright Act (the "**DMCA**"), including 17 U.S.C. § 1202, arising from Defendants' unauthorized reproduction, distribution, and sale of the Works, and Defendants' dissemination of false copyright management information ("**CMI**") in connection therewith.

11. Plaintiff further alleges violations of 17 U.S.C. § 1202(a), arising from false copyright management information appearing on the Works, and violations of 17 U.S.C. § 1202(b),

arising from Defendants' removal of copyright management information from certain of the Works.

12. Plaintiff seeks permanent injunctive relief; an accounting and disgorgement of Defendants' profits; actual damages and statutory damages for copyright infringement under 17 U.S.C. § 504, including statutory damages for willful copyright infringement where available; an award of statutory damages under 17 U.S.C. § 1203(c)(3)(B) for each violation of 17 U.S.C. § 1202 in an amount of not less than $2,500 and not more than $25,000 per violation; an award of attorneys' fees, costs, and expenses as available; pre-judgment and post-judgment interest; and such other and further relief as the Court deems just and proper.

## THE PARTIES

13. Plaintiff is a company organized and existing under the laws of the Isle of Man, British Isles, with its principal place of business at Bridge Chambers, West Quay, Ramsey, IM8 1DL, Isle of Man. Plaintiff is a publisher of traditional Catholic books.

14. Defendant Creative Media Partners, LLC ("**CMP**") is a limited liability company organized under the laws of Wyoming. CMP is engaged in the publication, reproduction, distribution, and sale of books through print-on-demand and wholesale distribution channels.

15. CMP was originally organized as a South Carolina limited liability company on August 3, 2016, under the name Creative Media, LLC, and was domesticated as a Wyoming limited liability company on March 16, 2017, at which time it adopted its current name.

16. Since that domestication, CMP's registered address on file with the Wyoming Secretary of State has at all times been that of a commercial registered agent. Upon information and belief, CMP's operations are principally conducted in and around Charleston, South Carolina,

where CMP maintains business addresses used for the shipment, return, and sale of its publications, and where each of the individual Defendants named herein resides or maintains a business address.

17. Defendant Robert Holt ("**Holt**") is, upon information and belief, a citizen and resident of South Carolina. Holt has identified himself in writing to Plaintiff as Chairman of CMP. In that written communication, Holt stated that he would direct the withdrawal of certain CMP titles from distribution through Ingram Content Group, demonstrating Holt's authority and practical ability to control CMP's publication and distribution activities. A copy of Holt's written correspondence to Plaintiff is attached and incorporated hereto as **Exhibit 1**.

18. Defendant Andrew Roskill ("**Roskill**") is, upon information and belief, a citizen and resident of South Carolina. Roskill has publicly represented, in his own professional profile, that he serves as Partner and Chief Financial Officer of CMP, a position he has held on a full-time basis since June 2021. Roskill is further identified in CMP's own business records, produced in this action as a primary point of contact for CMP's accounts with its print-on-demand manufacturer and distributor. Attached and incorporated hereto as **Exhibit 2** is a true and correct copy of Roskill's public professional profile containing these representations (last visited July 17, 2026).

19. Defendant Jason Youmans ("**Youmans**") is, upon information and belief, a citizen and resident of South Carolina. Youmans is identified in the 2016 Articles of Organization for Creative Media, LLC, CMP's predecessor entity, as its organizer. Youmans has further publicly represented, in his own professional profile, that he personally developed the large-scale, automated print-on-demand publishing pipeline used to process source material "into POD books," and that this system achieved a per-unit cost reduction of approximately 95%. Youmans is further identified in CMP's own business records produced in this action, as a point of contact for CMP's accounts with its print-on-demand manufacturer and distributor. Attached and incorporated hereto

as **Exhibit 3** is a true and correct copy of Youmans's public professional profile containing these representations (last visited July 17, 2026).

20. CMP, Holt, Roskill, and Youmans are individually referred to as a "**Defendant**" and collectively referred to herein as "**Defendants**."

## JURISDICTION AND VENUE

21. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a) because this action arises under the Copyright Act, 17 U.S.C. § 101 *et seq.,* and the Digital Millennium Copyright Act, including 17 U.S.C. § 1202.

22. This Court has personal jurisdiction over CMP because CMP purposefully directed infringing activities toward the United States, the State of North Carolina, and this District by causing unauthorized copies of Plaintiff's copyrighted works to be offered for sale, sold, shipped, and delivered to purchasers within this District through print-on-demand and wholesale retail channels. CMP further caused the infringing copies to be printed and manufactured in the United States through print-on-demand services operated by Lightning Source LLC.

23. Plaintiff's counsel purchased CMP's infringing editions of the Works within this District. Certain copies were ordered from Quail Ridge Books, an independent bookstore in Raleigh, Wake County, North Carolina, which, upon information and belief, obtained those copies on a print-on-demand basis through Ingram Content Group and Lightning Source LLC, and were collected by Plaintiff's counsel in person at the store; additional copies were purchased through Walmart and shipped and delivered to Wake County, North Carolina (as further alleged in ¶158 below). These purchases confirm that CMP's infringing editions were available for order, and were sold and delivered to purchasers, within this District through CMP's print-on-demand and wholesale distribution arrangements.

24. This Court also has personal jurisdiction over Holt, Roskill, and Youmans. Personal jurisdiction over each of them rests on his own acts, including acts he personally directed, authorized, or materially participated in while acting on CMP's behalf; an individual is not shielded from personal jurisdiction based on his own conduct merely because that conduct was undertaken in a corporate capacity.

25. Upon information and belief, Holt personally directed CMP's publication and distribution activities, including the decision to reproduce and republish the Works and the direction of CMP's distribution activities through which infringing copies were offered for sale, sold, and delivered to purchasers in this District.

26. Records produced by CMP's print-on-demand and distribution provider identify Roskill as the primary contact on CMP's publication and distribution accounts, including the designated recipient for CMP's internal ship-to, wholesale return, and publisher-compensation correspondence. Upon information and belief, Roskill directed and controlled the accounts and channels through which infringing copies were manufactured, distributed, sold, and shipped, including to purchasers in this District.

27. Upon information and belief, Youmans developed and operated the automated publishing pipeline used to produce the infringing copies described herein, which were offered for sale, sold, and delivered to purchasers in this District through the channels alleged herein.

28. By personally directing, authorizing, or materially participating in the infringing activities that CMP purposefully directed toward the United States, the State of North Carolina, and this District (as alleged in ¶22 above), each of Holt, Roskill, and Youmans is subject to personal jurisdiction in this District.

29. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b)(2) and 1400(a) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in

this District, including Defendants' offering of infringing books for sale to purchasers in this District and Defendants' causing infringing copies to be sold, shipped, and delivered into this District. Defendants are subject to personal jurisdiction in this District with respect to the claims asserted herein (as alleged in ¶¶22–28 above) and may accordingly be found in this District for purposes of 28 U.S.C. § 1400(a).

30. Venue is further proper because Defendants' infringing conduct has caused injury to Plaintiff within this District, and because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred within this District, including the sale and delivery of infringing copies to purchasers located here.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS FOR RELIEF

### A. Plaintiff's Background

31. Plaintiff Baronius Press Ltd is a publisher of traditional Catholic books founded in 2002. Plaintiff is well known for updating and republishing several titles that were previously out of print for many decades.

32. Since its founding, Plaintiff has published in excess of forty-five (45) titles. Over that period, Plaintiff has acquired ownership of, or the exclusive right to publish, several literary works and English-language translations thereof, including the Works at issue in this action.

### B. Plaintiff's Copyright Rights as an Exclusive Owner

33. **Table 1** below identifies, for each of the Works, the English-language work and, where applicable, the original foreign-language work from which it was translated (shown in italics), together with each work's copyright status and Plaintiff's rights therein. The specific facts supporting each entry in **Table 1** are set forth in the title-by-title allegations that follow.

| TABLE 1 | | | | | |
|---|---|---|---|---|---|
| **Work No.** | a) **English-language Work**<br>b) *Original (foreign-language) underlying Work* | **Author** | **Work is Copyright Protected (U.S.)** | **Plaintiff Holds Exclusive Rights** | **Plaintiff Owns All Copyright Rights** |
| 1 | This Tremendous Lover | Fr. Eugene Boylan | Yes* | Yes | — |
| 2 | Difficulties in Mental Prayer | Fr. Eugene Boylan | Yes* | Yes | — |
| 3 | A Mystic Under Arms | Fr. Eugene Boylan | Yes | Yes† | — |
| 4 | Saint Bernadette Soubirous | Fr. John Joyce | Yes | — | Yes |
| 5 (a) | The Mother of the Saviour and Our Interior Life | Fr. Bernard J. Kelly | Yes | — | Yes |
| 5 (b) | *La mère du Sauveur et notre vie intérieure* | *Reginald Garrigou-Lagrange* | *Yes** | *From Jan 4, 2016 through Dec 31, 2021* | — |
| 6 (a) | The Three Ways of the Spiritual Life | Burns Oates & Washbourne | No | — | — |
| 6 (b) | *Les trois conversions et les trois voies* | *Reginald Garrigou-Lagrange* | *Yes** | *From Jan 4, 2016 through Dec 31, 2021* | — |
| 7 | The Complete Works of Saint Teresa of Jesus | E. Allison Peers | Yes | — | Yes |
| 8 | Spain, the Church and the Orders | E. Allison Peers | Yes | — | Yes‡ |
| 9 | Fool of Love: The Life of Ramon Lull | E. Allison Peers | Yes | — | Yes‡ |
| 10 | Saint Teresa of Jesus and Other Essays and Addresses | E. Allison Peers | Yes | — | Yes‡ |
| 11 | Spirit of Flame: A Study of St. John of the Cross | E. Allison Peers | Yes | — | Yes‡ |
| 12 | Mother of Carmel: A Portrait of St. Teresa of Jesus | E. Allison Peers | Yes | — | Yes‡ |
| 13 | The Mystics of Spain | E. Allison Peers | Yes | — | Yes‡ |
| 14 | A Handbook to the Life and Times of St. Teresa and St. John of the Cross | E. Allison Peers | Yes | — | Yes‡ |

* Work that holds United States Copyright Office Registration Certificate

† Plaintiff acquired these exclusive rights on August 4, 2026, together with an assignment of all accrued rights, claims, and causes of action arising from infringement of the work occurring prior to that date, and the copyright owner's ratification of this pending action (as alleged in ¶56).

‡ Plaintiff owns all copyright rights in this Work, together with all accrued causes of action for infringement occurring prior to the assignment, by an Assignment of Copyright dated August 24, 2026 from the University of Liverpool (as alleged in ¶109)

**Work No. 1 – *This Tremendous Lover***

34. Plaintiff is the exclusive licensee of the literary work entitled *This Tremendous Lover*, authored by Fr. M. Eugene Boylan, O.C.R., a monk of the Cistercian Abbey of Mount St.

Joseph, Roscrea, County Tipperary, Ireland, and at all relevant times a national and domiciliary of Ireland.

35. *This Tremendous Lover* was first published in Ireland on or before September 5, 1946, by The Mercier Press, Limited.

36. Plaintiff holds these rights pursuant to a Memorandum of Agreement dated March 1, 2020, entered into with Mount St. Joseph Abbey, the copyright owner, granting Plaintiff the exclusive right to reproduce, adapt, publish, distribute, perform, and display the work, a copy of which is attached and incorporated hereto as **Exhibit 4**.

37. Upon information and belief, *This Tremendous Lover* was not published in the United States during the thirty-day period following its first publication in Ireland.

38. Ireland is the "source country" of *This Tremendous Lover* within the meaning of 17 U.S.C. § 104A(h)(8). *This Tremendous Lover* was protected by copyright in Ireland and had not entered the public domain in Ireland through expiration of its term of copyright protection as of January 1, 1996.

39. A United States edition of *This Tremendous Lover* was published by The Newman Press, Westminster, Maryland and registered with the United States Copyright Office on April 12, 1947, under Registration No. A29291.

40. The original term of the United States copyright in *This Tremendous Lover* was subject to renewal during its twenty-eighth year, between April 12, 1974 and April 12, 1975. No renewal registration for *This Tremendous Lover* was made during that period.

41. Upon information and belief, *This Tremendous Lover* was, immediately prior to the restoration of its copyright, in the public domain in the United States because it did not comply with formalities imposed at any time under United States copyright law.

42. *This Tremendous Lover* is a "restored work" within the meaning of 17 U.S.C. § 104A(h)(6), and copyright in the work was automatically restored in the United States on January 1, 1996, pursuant to 17 U.S.C. § 104A.

43. Copyright in *This Tremendous Lover* remains in full force and effect in the United States.

44. *This Tremendous Lover* is not a "United States work" as defined in 17 U.S.C. § 101, and the registration requirement of 17 U.S.C. § 411(a) does not apply to it. Plaintiff additionally holds United States Copyright Office Registration No. TX0005795374, effective May 25, 2016, covering Plaintiff's rights in the work, a copy of which is attached and incorporated hereto as **Exhibit 5**.

**Work No. 2 – *Difficulties in Mental Prayer***

45. Plaintiff is the exclusive licensee of the literary work entitled *Difficulties in Mental Prayer*, authored by Fr. M. Eugene Boylan, O.C.R., a monk of the Cistercian Abbey of Mount St. Joseph, Roscrea, County Tipperary, Ireland, and at all relevant times a national and domiciliary of Ireland.

46. *Difficulties in Mental Prayer* was first published in Ireland on or before August 26, 1943 by M. H. Gill & Son Ltd, Dublin.

47. Plaintiff holds these rights pursuant to a Memorandum of Agreement dated September 11, 2015, entered into with Mount St. Joseph Abbey, the copyright owner, granting Plaintiff the exclusive right to reproduce, adapt, publish, distribute, perform, and display the work, a copy of which is attached and incorporated hereto as **Exhibit 6**.

48. Upon information and belief, *Difficulties in Mental Prayer* was not published in the United States during the thirty-day period following its first publication in Ireland.

49. Ireland is the "source country" of *Difficulties in Mental Prayer* within the meaning of 17 U.S.C. § 104A(h)(8). *Difficulties in Mental Prayer* was protected by copyright in Ireland and had not entered the public domain in Ireland through expiration of its term of copyright protection as of January 1, 1996.

50. Upon information and belief, *Difficulties in Mental Prayer* was, immediately prior to the restoration of its copyright, in the public domain in the United States because it did not comply with formalities imposed at any time under United States copyright law.

51. *Difficulties in Mental Prayer* is a "restored work" within the meaning of 17 U.S.C. § 104A(h)(6), and copyright in the work was automatically restored in the United States on January 1, 1996, pursuant to 17 U.S.C. § 104A.

52. Copyright in *Difficulties in Mental Prayer* remains in full force and effect in the United States.

53. *Difficulties in Mental Prayer* is not a "United States work" as defined in 17 U.S.C. § 101, and the registration requirement of 17 U.S.C. § 411(a) does not apply to it. Plaintiff additionally holds United States Copyright Office Registration No. TX0005795333, effective May 26, 2016, covering Plaintiff's rights in the work, a copy of which is attached and incorporated hereto as **Exhibit 7**.

**Work No. 3 – *A Mystic Under Arms***

54. Plaintiff is the exclusive licensee of the literary work entitled *A Mystic Under Arms*, authored by Fr. M. Eugene Boylan, O.C.R., a monk of the Cistercian Abbey of Mount St. Joseph, Roscrea, County Tipperary, Ireland, and at all relevant times a national and domiciliary of Ireland.

55. *A Mystic Under Arms* was first published in Ireland on or before November 8, 1945, by The Mercier Press, Limited.

56. Plaintiff holds these rights pursuant to a Memorandum of Agreement dated August 4, 2026, entered into with Mount St. Joseph Abbey, the copyright owner, granting Plaintiff the exclusive right to reproduce, adapt, publish, distribute, perform, and display the work, together with an assignment of all rights, claims, and causes of action arising from any infringement of the copyright in the work occurring at any time prior to the date of that Agreement, including the infringing conduct alleged herein. In this Memorandum of Agreement, Mount St. Joseph Abbey further ratified Plaintiff's commencement and prosecution of this action, including as originally commenced on February 11, 2026, and its continued prosecution to final judgment or settlement, and confirmed Plaintiff's authority to pursue and recover upon the assigned rights, claims, and causes of action in this action. Plaintiff commenced that action on behalf of Mount St. Joseph Abbey pursuant to a Power of Attorney dated September 11, 2015, a copy of which is attached and incorporated hereto as **Exhibit 8**. A copy of the Memorandum of Agreement is attached and incorporated hereto as **Exhibit 9.**

57. Upon information and belief, *A Mystic Under Arms* was not published in the United States during the thirty-day period following its first publication in Ireland.

58. Ireland is the "source country" of *A Mystic Under Arms* within the meaning of 17 U.S.C. § 104A(h)(8). *A Mystic Under Arms* was protected by copyright in Ireland and had not entered the public domain in Ireland through expiration of its term of copyright protection as of January 1, 1996.

59. Upon information and belief, *A Mystic Under Arms* was, immediately prior to the restoration of its copyright, in the public domain in the United States because it did not comply with formalities imposed at any time under United States copyright law.

60. *A Mystic Under Arms* is a "restored work" within the meaning of 17 U.S.C. § 104A(h)(6), and copyright in the work was automatically restored in the United States on January 1, 1996, pursuant to 17 U.S.C. § 104A.

61. Copyright in *A Mystic Under Arms* remains in full force and effect in the United States.

62. *A Mystic Under Arms* is not a "United States work" as defined in 17 U.S.C. § 101 and is not the subject of a United States copyright registration. The registration requirement of 17 U.S.C. § 411(a) does not apply to *A Mystic Under Arms*, and, to the extent enforcement of rights in this work requires such registration, Plaintiff pleads exemption therefrom pursuant to 17 U.S.C. § 411(a).

**Work No. 4 – *Saint Bernadette Soubirous***

63. Plaintiff is the owner of the copyright in the English-language work entitled *Saint Bernadette Soubirous*, translated by Fr. John Joyce, a national or domiciliary of the United Kingdom, having acquired all rights therein on May 2, 2019 by assignment from The Society of Jesus, London, United Kingdom**.** A copy of that Agreement is attached and incorporated hereto as **Exhibit 10**.

64. *Saint Bernadette Soubirous* was first published in the United Kingdom on or before November 23, 1957 by Longmans, Green and Co., Ltd.

65. Upon information and belief, *Saint Bernadette Soubirous* was not published in the United States during the thirty-day period following its first publication in the United Kingdom.

66. The United Kingdom is the "source country" of *Saint Bernadette Soubirous* within the meaning of 17 U.S.C. § 104A(h)(8). *Saint Bernadette Soubirous* was protected by copyright in

the United Kingdom and had not entered the public domain in United Kingdom through expiration of its term of copyright protection as of January 1, 1996.

67. Upon information and belief, *Saint Bernadette Soubirous* was, immediately prior to the restoration of its copyright, in the public domain in the United States because it did not comply with formalities imposed at any time under United States copyright law.

68. *Saint Bernadette Soubirous* is a "restored work" within the meaning of 17 U.S.C. § 104A(h)(6), and copyright in the work was automatically restored in the United States on January 1, 1996, pursuant to 17 U.S.C. § 104A.

69. Copyright in *Saint Bernadette Soubirous* remains in full force and effect in the United States.

70. *Saint Bernadette Soubirous* is not a "United States work" as defined in 17 U.S.C. § 101, and the registration requirement of 17 U.S.C. § 411(a) does not apply to it. To the extent enforcement of rights in this work requires such registration, Plaintiff pleads exemption therefrom pursuant to 17 U.S.C. § 411(a).

71. *Saint Bernadette Soubirous* is an English-language translation of the underlying work in French entitled *Sainte Bernadette Soubirous*, authored by Msgr. François Trochu.

72. The original French edition of *Sainte Bernadette Soubirous* was authored by Msgr. François Trochu, a national of France and domiciliary of France, and first published in 1954 by Emmanuel Vitte in Lyon, France.

73. Upon information and belief, copyright in the French original *Sainte Bernadette Soubirous* is held by the Diocese of Nantes and remains in force in France and, as a restored work under 17 U.S.C. § 104A, in the United States. Msgr. Trochu died in 1967, and the work remains within its term of copyright protection.

74. Plaintiff asserts no claim based on copyright in the French original *Sainte Bernadette Soubirous*; Plaintiff's claims with respect to Work No. 4 are based on Plaintiff's ownership of the English-language translation by Fr. John Joyce (as alleged in ¶63 above).

**Work No. 5 – (a) *The Mother of the Saviour and Our Interior Life***

75. Plaintiff is the owner of the copyright in the English-language work entitled *The Mother of the Saviour and Our Interior Life*, translated by Fr. Bernard J. Kelly, a national or domiciliary of Ireland, having acquired all rights therein on November 5, 2015 by assignment from the Congregation of the Holy Spirit, Dublin, Ireland. A copy of that Agreement is attached and incorporated hereto as **Exhibit 11.**

76. *The Mother of the Saviour and Our Interior Life* was first published in Ireland on or before March 25, 1949 by Golden Eagle Books Ltd, Dublin.

77. Upon information and belief, *The Mother of the Saviour and Our Interior Life* was not published in the United States during the thirty-day period following its first publication in Ireland.

78. Ireland is the "source country" of *The Mother of the Saviour and Our Interior Life* within the meaning of 17 U.S.C. § 104A(h)(8). *The Mother of the Saviour and Our Interior Life* was protected by copyright in Ireland and had not entered the public domain in Ireland through expiration of its term of copyright protection as of January 1, 1996.

79. Upon information and belief, *The Mother of the Saviour and Our Interior Life* was, immediately prior to the restoration of its copyright, in the public domain in the United States because it did not comply with formalities imposed at any time under United States copyright law.

80. *The Mother of the Saviour and Our Interior Life* is a "restored work" within the meaning of 17 U.S.C. § 104A(h)(6), and copyright in the work was automatically restored in the United States on January 1, 1996, pursuant to 17 U.S.C. § 104A.

81. Copyright in *The Mother of the Saviour and Our Interior Life* remains in full force and effect in the United States.

82. *The Mother of the Saviour and Our Interior Life* is not a "United States work" as defined in 17 U.S.C. § 101, and the registration requirement of 17 U.S.C. § 411(a) does not apply to it, and, to the extent enforcement of rights in this work requires such registration, Plaintiff pleads exemption therefrom pursuant to 17 U.S.C. § 411(a).

83. *The Mother of the Saviour and Our Interior Life* is an English-language translation of the underlying work in French entitled *La mère du Sauveur et notre vie intérieure*, authored by Reginald Garrigou-Lagrange.

**Work No. 5 – (b) *La mère du Sauveur et notre vie intérieure***

84. The original French edition of *La mère du Sauveur et notre vie intérieure* was authored by Reginald Garrigou-Lagrange, a national of France and domiciliary of Italy, and first published in 1941 by Éditions de l'Abeille in Lyon, France.

85. Plaintiff was the owner of an exclusive license, granted by the Dominican Province of France, to publish an English-language translation of *La mère du Sauveur et notre vie intérieure* from January 4, 2016 through December 31, 2021. A copy of that Agreement, with addenda, is attached and incorporated hereto as **Exhibit 12**.

86. Upon information and belief, *La mère du Sauveur et notre vie intérieure* was not published in the United States during the thirty-day period following its first publication in France.

87. France is the "source country" of *La mère du Sauveur et notre vie intérieure* within the meaning of 17 U.S.C. § 104A(h)(8). *La mère du Sauveur et notre vie intérieure* was protected by copyright in France and had not entered the public domain in France through expiration of its term of copyright protection as of January 1, 1996.

88. Upon information and belief, *La mère du Sauveur et notre vie intérieure* was, immediately prior to the restoration of its copyright, in the public domain in the United States because it did not comply with formalities imposed at any time under United States copyright law.

89. *La mère du Sauveur et notre vie intérieure* is a "restored work" within the meaning of 17 U.S.C. § 104A(h)(6), and copyright in the work was automatically restored in the United States on January 1, 1996, pursuant to 17 U.S.C. § 104A.

90. Copyright in *La mère du Sauveur et notre vie intérieure* remains in full force and effect in the United States.

91. *La mère du Sauveur et notre vie intérieure* is registered with the United States Copyright Office in the name of the Dominican Province of France under Registration No. VA0001437200, effective July 15, 2019, a copy of which is attached and incorporated hereto as **Exhibit 13**.

92. CMP's editions of Work No. 5, identified in **Table 3** below, reproduce the English-language translation of *La mère du Sauveur et notre vie intérieure* and thereby reproduce protected expression of that underlying French work.

**Work No. 6 – (a) *The Three Ways of the Spiritual Life***

93. *The Three Ways of the Spiritual Life* is an English-language translation of the underlying work in French entitled *Les trois conversions et les trois voies*, authored by Reginald Garrigou-Lagrange.

94. Upon information and belief, the English-language work *The Three Ways of the Spiritual Life* (also known as *The Three Conversions in the Spiritual Life*), first published in the United Kingdom on or before June 30, 1938 by Burns, Oates & Washbourne Ltd, has been in the public domain in the United States since its first publication in 1938.

95. Plaintiff asserts no claim based on copyright in the English-language translation *The Three Ways of the Spiritual Life;* Plaintiff's claims with respect to Work No. 6 are based on Plaintiff's exclusive right to publish an English-language translation of the underlying French work *Les trois conversions et les trois voies* (as alleged below).

**Work No. 6 – (b) *Les trois conversions et les trois voies***

96. The original French edition of *Les trois conversions et les trois voies* was authored by Reginald Garrigou-Lagrange, a national of France and domiciliary of Italy, and first published in 1932 by Les Éditions du Cerf, France.

97. Plaintiff was the owner of an exclusive license, granted by the Dominican Province of France, to publish an English-language translation of *Les trois conversions et les trois voies* from January 4, 2016 through December 31, 2021. A copy of that Agreement, with addenda, is attached and incorporated hereto as **Exhibit 14.**

98. Upon information and belief, *Les trois conversions et les trois voies* was not published in the United States during the thirty-day period following its first publication in France.

99. France is the "source country" of *Les trois conversions et les trois voies* within the meaning of 17 U.S.C. § 104A(h)(8). *Les trois conversions et les trois voies* was protected by copyright in France and had not entered the public domain in France through expiration of its term of copyright protection as of January 1, 1996.

100. Upon information and belief, *Les trois conversions et les trois voies* was, immediately prior to the restoration of its copyright, in the public domain in the United States because it did not comply with formalities imposed at any time under United States copyright law.

101. *Les trois conversions et les trois voies* is a "restored work" within the meaning of 17 U.S.C. § 104A(h)(6), and copyright in the work was automatically restored in the United States on January 1, 1996, pursuant to 17 U.S.C. § 104A.

102. Copyright in *Les trois conversions et les trois voies* remains in full force and effect in the United States.

103. *Les trois conversions et les trois voies* is registered with the United States Copyright Office in the name of the Dominican Province of France under Registration No. VA0001437202, effective July 15, 2019, a copy of which is attached and incorporated hereto as **Exhibit 15.**

104. CMP's editions of Work No. 6, identified in **Table 3** below, reproduce the English-language translation of *Les trois conversions et les trois voies* and thereby reproduce protected expression of that underlying French work.

**Works Nos. 7 – 14**

105. **Table 2** below identifies, for each of the Works Nos. 7-14, its title, its date of first publication, and its original publisher. The specific facts supporting Plaintiff's rights in the Works are set forth in the allegations that follow.

| TABLE 2 | | | |
|---|---|---|---|
| **Work No.** | **Title** | **First Publication Date** | **Original Publisher** |
| 7 | The Complete Works of Saint Teresa of Jesus | 1946 | Sheed and Ward, London, United Kingdom |
| 8 | Spain, the Church and the Orders | 1939 | Eyre & Spottiswoode, London, United Kingdom |
| 9 | Fool of Love: The Life of Ramon Lull | 1946 | S.C.M. Press Ltd., London, United Kingdom |
| 10 | Saint Teresa of Jesus and Other Essays and Addresses | 1953 | Faber and Faber Ltd., London, United Kingdom |
| 11 | Spirit of Flame: A Study of St. John of the Cross | Mar. 11, 1943 | S.C.M. Press Ltd., London, United Kingdom |
| 12 | Mother of Carmel: A Portrait of St. Teresa of Jesus | Dec. 20, 1945 | S.C.M. Press Ltd., London, United Kingdom |
| 13 | The Mystics of Spain | 1951 | George Allen & Unwin Ltd., London, United Kingdom |
| 14 | A Handbook to the Life and Times of St. Teresa and St. John of the Cross | 1954 | Burns Oates, London, United Kingdom |

106. Each of the Works No. 7-14 is a foreign work whose country of origin is the United Kingdom and is not a "United States work" as defined in 17 U.S.C. § 101. The registration requirement of 17 U.S.C. § 411(a) therefore does not apply to Plaintiff's claims, and, to the extent enforcement of Plaintiff's rights in any Work requires registration, Plaintiff pleads exemption therefrom pursuant to 17 U.S.C. § 411(a).

107. Plaintiff is the owner of the copyright in each of the Works No. 7-14. Each of the Works No. 7-14 was authored by Edgar Allison Peers ("E. Allison Peers"), a national and domiciliary of the United Kingdom who died in 1952.

108. Plaintiff acquired all copyright and other assignable rights in E. Allison Peers' contributions to Work No. 7 (*The Complete Works of Saint Teresa of Jesus)* by an Assignment of Copyright dated September 16, 2019 from the University of Liverpool, United Kingdom, a copy of which is attached and incorporated hereto as **Exhibit 16**. Plaintiff has held that copyright at all times since September 16, 2019, including throughout the period of the infringement alleged herein.

109. Plaintiff acquired all copyright and other assignable rights in E. Allison Peers' contributions to the Works No. 8-14, including his authorship and, where applicable, his translation, selection, arrangement, compilation, and editorial contributions, together with all accrued causes of action for infringement of those copyrights occurring before the date of the assignment, including the infringing conduct alleged herein, by an Assignment of Copyright dated August 24, 2026 from the University of Liverpool, United Kingdom, a copy of which is attached and incorporated hereto as **Exhibit 17**.

110. Each of the Works No. 7-14 was first published in the United Kingdom on the date and by the publisher identified in **Table 2**. Upon information and belief, none of the Works No. 7-14 was published in the United States during the thirty-day period following its first publication in the United Kingdom. The United Kingdom is the "source country" of each of the Works No. 7-14 within the meaning of 17 U.S.C. § 104A(h)(8), and each of the Works No. 7-14 was protected by copyright in the United Kingdom and had not entered the public domain in the United Kingdom through expiration of its term of copyright protection as of January 1, 1996.

111. Upon information and belief, each of the Works No. 7-14 was, immediately prior to the restoration of its copyright, in the public domain in the United States because it did not comply with formalities imposed at any time under United States copyright law, including, as to any Work No. 7-14 for which a United States copyright was secured, the failure to renew that copyright. Each of the Works No. 7-14 is a "restored work" within the meaning of 17 U.S.C. § 104A(h)(6), and

copyright in each of the Works was automatically restored in the United States on January 1, 1996, pursuant to 17 U.S.C. § 104A. Copyright in each of the Works No. 7-14 remains in full force and effect in the United States.

112. Work No. 8 (*Spain, the Church and the Orders*), Work No. 9 (*Fool of Love: The Life of Ramon Lull)*, Work No. 10 (*Saint Teresa of Jesus and Other Essays and Addresses*) and Work No. 13 (*The Mystics of Spain*) were not published in any United States edition.

113. Work No. 7 (*The Complete Works of Saint Teresa of Jesus*) was published in a United States edition by Sheed and Ward; that edition was printed in Great Britain. Work No. 7 was not registered with the United States Copyright Office.

114. A United States edition of Work No. 11 (*Spirit of Flame: A Study of St. John of the Cross*) was published in New York by Morehouse-Gorham Co. and was registered with the United States Copyright Office on January 17, 1944 under Registration No. A 178161.

115. The original term of the United States copyright in Work No. 11 was subject to renewal during its twenty-eighth year, between January 17, 1971 and January 17, 1972. No renewal registration for Work No. 11 was made during that period.

116. A United States edition of Work No. 12 (*Mother of Carmel: A Portrait of St. Teresa of Jesus*) was published in New York by Morehouse-Gorham Co. and was registered with the United States Copyright Office on February 2, 1946 under Registration No. A2700.

117. The original term of the United States copyright in Work No. 12 was subject to renewal during its twenty-eighth year, between February 2, 1973 and February 2, 1974. No renewal registration for Work No. 12 was made during that period.

118. A United States edition of Work No. 14 (*A Handbook to the Life and Times of St. Teresa and St. John of the Cross*) was published by The Newman Press, Westminster, Maryland

and that edition was printed in Great Britain. Work No. 14 was not registered with the United States Copyright Office at the time.

### C. Defendants' Publishing Activities, Experience, and Background

119. CMP is a publishing company engaged in the mass-scale publication, distribution, marketing, and sale of books through print-on-demand and wholesale distribution channels. Upon information and belief, based on publisher records maintained by Open Library (openlibrary.org), a public book catalog database, CMP has published, or caused to be published, in excess of 500,000 purported literary works under its own name and its imprints.

120. Upon information and belief, CMP's publishing model does not involve the acquisition, editing, or curation of new literary works, but instead consists of the automated digitization and reproduction of pre-existing material, assigned new International Standard Book Numbers ("**ISBNs**") and offered for sale as purportedly public-domain reprint editions, without meaningful review of the copyright status of the underlying material. Consistent with this automated process, CMP typically generates multiple separate ISBN-assigned editions, including, at minimum, separate paperback and hardcover formats, for each underlying work it reproduces, as reflected in CMP's publication of the Works described herein.

121. Upon information and belief, CMP has operated under or utilized one or more publishing imprints or publisher designations, including Creative Media Partners, LLC, Hassell Street Press, Legare Street Press, and Franklin Classics.

122. In a written communication to Plaintiff, Robert Holt identified himself as Chairman of CMP and represented that CMP had been engaged in the business of mass-market reproduction and republication of books since approximately 2005. *See* **Exhibit 1**.

123. Holt, Roskill, Youmans, and Mitchell Davis are not new entrants to the print-on-demand publishing industry. Publicly available information, including representations these individuals have made about their own professional histories, and contemporaneous public reporting concerning the businesses they founded and operated, reflects the facts alleged below. Attached and incorporated hereto as **Exhibit 18** are true and correct copies of publicly available materials concerning the founding, operation and acquisition of BookSurge LLC and BiblioLabs, LLC.

124. Holt, Roskill, Youmans, and Davis founded or served as senior principals of BookSurge, a print-on-demand publishing company, from approximately 2000 until its acquisition by Amazon.com, Inc. in 2005. The same four individuals thereafter co-founded BiblioLabs, LLC in 2006, a Charleston, South Carolina-based digital publishing and content-distribution company, where each served in senior executive or technical roles until BiblioLabs, LLC was acquired by LYRASIS, a nonprofit organization, in June 2021.

125. Holt served as Chief Executive Officer of BookSurge and thereafter as Chief Executive Officer and later Chairman of BiblioLabs, LLC. Holt holds a Juris Doctor degree from the University of South Carolina School of Law and a Master of Laws degree in Taxation from the University of Florida College of Law, and worked as a mergers-and-acquisitions strategist before entering the publishing industry.

126. Roskill served as Chief Financial Officer of BookSurge and, upon information and belief, helped facilitate its 2005 acquisition by Amazon.com, Inc. Roskill thereafter served as Chief Business Officer and Partner of BiblioLabs, LLC, and has publicly described himself as a founder and Chief Executive Officer of BiblioLabs, LLC.

127. Youmans co-founded BookSurge, where he is credited with architecting and building the company's software application for authors and publishers. Youmans thereafter joined

BiblioLabs, LLC as its Chief Information Officer in 2007, where he built the company's "Global Book Manager" application platform.

128. Upon information and belief, the print-on-demand businesses operated by BiblioLabs, LLC had as their core function the reproduction and sale of works represented to be in the public domain. Publicly available reporting describes BiblioLabs as the owner of BiblioBazaar, which offered print-on-demand editions of public-domain content and produced up to one thousand printed books per day, and of BiblioLife, an imprint through which such content was published, and reports that BiblioLabs had, through those print-on-demand businesses, amassed a large archive of public-domain content. *See* **Exhibit 18.**

129. Youmans has publicly represented, in his own professional profile, that since January 2017 he has operated a self-employed venture identified as "Publishing Solutions," based in Jackson, Wyoming, through which he "developed a large-scale, white label, POD publishing pipeline," created "several new proprietary systems" to "analyze, process several hundred million images into POD books," and achieved "a per-unit cost reduction of ~95%."

130. Upon information and belief, the pipeline described in that representation is the automated publishing pipeline that CMP used to reproduce the Works, as alleged herein. That belief is based upon, among other things: the correspondence in time between the commencement of that venture in January 2017 and CMP's domestication as a Wyoming limited liability company in March 2017 (as alleged in ¶15 above); the venture's location in Wyoming, CMP's state of organization; the absence from Youmans's professional profile of any other publishing venture or client during that period; and the "white label" character of the pipeline, consistent with CMP's publication of works under multiple imprints (as alleged in ¶121 above).

131. Each of Holt, Roskill, and Youmans has, by his own account, spent in excess of two decades in the print-on-demand publishing industry, including specific prior experience with

businesses whose core function involved reproducing and distributing source material of uncertain or historical copyright status. Defendants' publication of the Works, and their dissemination of false and misleading copyright management information in connection therewith, occurred against this backdrop of substantial, directly relevant industry experience.

132. In the print-on-demand publishing industry, works sourced from pre-existing material cannot reliably be presumed to be in the public domain without case-by-case verification of their copyright status.

133. The need for such case-by-case verification is particularly acute for works of foreign origin, whose United States copyrights may have been restored under 17 U.S.C. § 104A notwithstanding earlier noncompliance with United States formalities.

134. By virtue of the experience (as alleged in ¶¶123–131 above), including decades of operating businesses whose core function was the reproduction and distribution of source material of uncertain or historical copyright status, and, in Holt's case, by virtue of his legal training as well, Holt, Roskill, and Youmans were each aware of the need for such verification.

135. The automated publishing pipeline described above incorporates no such verification step. Holt, Roskill and/or Youmans knew that the Works reproduced through that pipeline, including the Works, were uniformly offered for sale as purportedly public-domain reprint editions.

136. Upon information and belief, the omission by Holt, Roskill and/or Youmans of any verification step was a deliberate design choice, made to achieve the scale and cost efficiencies (as alleged in ¶129 above), rather than an inadvertent oversight. At a minimum, that omission reflects the conscious disregard by Holt, Roskill and/or Youmans of a known and obvious risk that works reproduced through the pipeline, including the Works, remained protected by copyright notwithstanding the public-domain representations CMP disseminated concerning them.

137. In or about February 2017, more than 22,000 academic theses belonging to graduates of the University of Hong Kong appeared for sale on Amazon and other online retailers under CMP's imprint "Open Dissertation Press," having been captured *en masse* from the university's open-access repository and republished commercially without the permission of the authors or the university, as described by the University of Hong Kong at https://hub.hku.hk/local/hku_theses_on_amazon_and_other_online_retailers/ (last visited August 26, 2026).

138. Upon information and belief, when the university objected and issued take-down notices, CMP publicly responded, in an open letter dated March 20, 2017, that it had "never knowingly violated anyone's copyright" and that the theses had appeared under a Creative Commons license permitting commercial use, and demanded that the university cease issuing take-down notices.

139. The statements subsequently published by CMP on its website in connection with this episode, including the notices announcing the removal of that open letter, were signed by Youmans as Chief Executive Officer of CMP, as published by CMP at https://creativemediapartnersblog.wordpress.com/ (last visited August 26, 2026).

140. In fact, the license on which CMP claimed to have relied had been erroneously displayed on the university's repository for approximately ten weeks before being corrected, and the university did not own, and could not license, commercial rights in its students' thesis, each of which stated on its face that the author retained all proprietary rights. By email dated March 22, 2018, CMP acknowledged in writing that the university's students "only give noncommercial rights" in their dissertations, and CMP thereafter removed all of the university's dissertations from manufacture and distribution.

141. Accordingly, since no later than March 2018, CMP, Youmans personally knew that the availability of digitized material through an online repository or database does not establish the right to reproduce and sell that material commercially, that the copyright rights labels displayed by third-party databases may be erroneous, and that commercial republication of digitized works requires verification of the underlying copyright rights. CMP's subsequent reproduction and sale of the Works alleged herein, without any such verification, occurred with that knowledge.

142. Since no later than May 2017, approximately two months after the events (as alleged in ¶¶137–140 above), CMP has maintained on its website a standing copyright-complaint form, inviting any person who "feel[s] we have unintentionally infringed on an existing copyright" to submit the details of the claim for investigation. The same page states that CMP's books "are reproductions published before 1923 or are otherwise found in the public domain." Each of the Works was first published between 1938 and 1957. Upon information and belief, the maintenance of a standing mechanism for receiving copyright-infringement claims, in place of any process for verifying rights before publication, reflects CMP's awareness that works reproduced through its automated pipeline would include works protected by copyright, and its election to address such infringements only after the fact, upon complaint by the injured rights holder. A printout of CMP's webpage https://support.creativemedia.io/copyright/ (last visited August 26, 2026) is attached and incorporated hereto as **Exhibit 19.**

143. CMP has maintained publishing and distribution accounts through which titles have been submitted for manufacture, distribution, and sale through Lightning Source LLC, Ingram Content Group, and related retail and wholesale distribution channels. Upon information and belief, the agreements governing those accounts required CMP to represent and warrant, for each title CMP submitted, that CMP owned or had lawfully obtained the rights necessary to reproduce and distribute that title, and that the title could be sold and distributed without infringing the copyright

of any person or entity. That belief is based upon, among other things, the published terms and conditions governing Lightning Source's print-on-demand publishing services, under which the publisher represents and warrants that "it is the owner of, or has lawfully obtained the legal authority from the authors or owners of, each of the Titles and all copyrights related thereto, in order to print, or have printed, and to distribute, or have distributed, the Titles," and that "the Titles can be sold, marketed, displayed, distributed, and/or otherwise promoted by Lightning Source without violating or infringing the rights of any other person or entity, including without limitation, infringing any copyright." The agreements executed by CMP are within Defendants' and their distributors' possession, custody, and control.

144. Upon information and belief, those agreements further required CMP to represent and warrant that the metadata it supplied was accurate and did not infringe the copyright of any person or entity. That belief is based upon, among other things, the published data supply terms and conditions incorporated into Lightning Source's print-on-demand publishing services, under which the publisher represents and warrants "that the Data provided by Publisher to LS is accurate" and "that the Data or its distribution does not infringe any copyright or other intellectual property right." The false copyright management information alleged herein was transmitted by CMP to Lightning Source LLC and Ingram Content Group as part of that metadata (as alleged in ¶¶186–187 below).

145. Upon information and belief, at all relevant times, Holt, as Chairman, Roskill, as Chief Financial Officer, and Youmans, as the architect of CMP's automated publishing pipeline, each had the right and ability to direct, supervise, and control CMP's publication, distribution, and sale of its infringing editions of the Works.

146. Upon information and belief, Holt directed and controlled CMP's overall publishing operations, including the decision to reproduce and republish the Works. That belief is based upon,

among other things, Holt's written identification of himself as Chairman of CMP, his representation that CMP has been engaged in the business of mass-market reproduction and republication of books since approximately 2005, and his statement, in that same written communication, that he would direct that Works Nos. 1 through 3 be withdrawn from distribution through Ingram Content Group, demonstrating his authority over, and practical ability to control, CMP's publication and distribution decisions (as alleged in ¶17 above).

147. Upon information and belief, Roskill directed and controlled CMP's financial and distribution relationships, including the accounts described above through which the infringing editions of the Works were manufactured, distributed, and sold, and through which the copyright management information alleged herein was transmitted via the ONIX metadata feed. That belief is based upon, among other things, records produced by CMP's print-on-demand and distribution provider identifying Roskill as the primary contact on CMP's publication and distribution accounts, including as the designated recipient of CMP's internal ship-to, wholesale return, and publisher-compensation correspondence, and Roskill's own public identification of himself as Chief Financial Officer and Partner of CMP (as alleged in ¶¶18 and 26 above).

148. Youmans personally organized CMP's predecessor entity, Creative Media, LLC, with the South Carolina Secretary of State in 2016. Upon information and belief, Youmans designed, built, and controlled the automated publishing pipeline (as described in ¶129 above), which CMP used to reproduce the Works and to generate the copyright management information, and the omissions of copyright pages and notices, appearing on CMP's infringing editions of the Works, as alleged herein.

149. Upon information and belief, each of Holt, Roskill, and Youmans holds a membership or other ownership interest in CMP, or otherwise shares in the revenues and profits of CMP's publishing operation, and each accordingly derived a direct financial benefit from CMP's

publication, distribution, and sale of its infringing editions of the Works**.** That belief is based upon, among other things, Roskill's own public description of himself as a Partner of CMP (as alleged in ¶18 above); Youmans's organization of CMP's predecessor entity (as alleged in ¶148 above); and CMP's operation as a closely held company by the same small group of individuals who together founded, operated, and sold BookSurge and BiblioLabs, LLC (as alleged in ¶124 above).

150. Wyoming, CMP's state of organization, does not require public disclosure of the members of a limited liability company. The precise allocation of ownership interests, compensation, and distributions among Holt, Roskill, and Youmans, and the precise allocation of operational responsibilities among them, including which individual selected or approved source files, authorized ISBN submissions, controlled the ONIX metadata, and directed distribution, are matters uniquely within Defendants' possession, custody, and control.

**D. Defendants' Unlawful Activities**

**(i) <u>The Infringing Works</u>**

151. CMP published, distributed, and sold unauthorized editions of the Works through major retailers and online marketplaces in the United States and elsewhere, as identified in **<u>Table 3</u>** below (collectively, the "**Infringing Works**"). As used herein, an "ISBN-assigned edition" means a separately ISBN-identified paperback or hardcover edition of an Infringing Work, as set out in that table; the thirty ISBN-assigned editions so identified comprise editions of the fourteen Works.

(The remaining portion of this page is intentionally left blank.)

| TABLE 3 | | | | |
|---|---|---|---|---|
| **Infringing Work No.** | **Title** | **Publication Date** | **Edition** | **ISBN** |
| 1 | This Tremendous Lover | Sep 9, 2021 | Paperback | 9781014810397 |
| | This Tremendous Lover | Sep 9, 2021 | Hardcover | 9781014095091 |
| 2 | Difficulties in Mental Prayer | Sep 9, 2021 | Paperback | 9781013305436 |
| | Difficulties in Mental Prayer | Sep 9, 2021 | Hardcover | 9781013308314 |
| 3 | A Mystic Under Arms; | Sep 9, 2021 | Paperback | 9781015010079 |
| | A Mystic Under Arms; | Sep 9, 2021 | Hardcover | 9781014216410 |
| 4 | Saint Bernadette Soubirous, 1844-1879 | Sep 9, 2021 | Paperback | 9781015032835 |
| | Saint Bernadette Soubirous, 1844-1879 | Sep 9, 2021 | Hardcover | 9781014229199 |
| 5 | The Mother of the Saviour and Our Interior Life | Sep 9, 2021 | Paperback | 9781014765024 |
| | The Mother of the Saviour and Our Interior Life | Sep 9, 2021 | Hardcover | 9781014066862 |
| 6 | The Three Ways of the Spiritual Life | Sep 9, 2021 | Paperback | 9781015112384 |
| | The Three Ways of the Spiritual Life | Sep 9, 2021 | Hardcover | 9781014279255 |
| 7 | The Complete Works of Saint Teresa of Jesus, Tr. and Ed. by E. Allison Peers From the Critical Ed. of P. Silverio De Santa Teresa | Sep 9, 2021 | Paperback | 9781014493408 |
| | The Complete Works of Saint Teresa of Jesus, Tr. and Ed. by E. Allison Peers From the Critical Ed. of P. Silverio De Santa Teresa | Sep 9, 2021 | Hardcover | 9781013867828 |
| | The Complete Works of Saint Teresa of Jesus, Volume 1 | Jul 18, 2023 | Paperback | 9781022232150 |
| | The Complete Works of Saint Teresa of Jesus, Volume 1 | Jul 18, 2023 | Hardcover | 9781020804205 |
| 8 | Spain, the Church and the Orders | Sep 10, 2021 | Paperback | 9781014976314 |
| | Spain, the Church and the Orders | Sep 9, 2021 | Hardcover | 9781014196415 |
| 9 | Fool of Love; | Sep 10, 2021 | Paperback | 9781015184572 |
| | Fool of Love; | Sep 9, 2021 | Hardcover | 9781014324153 |
| 10 | Saint Teresa of Jesus, and Other Essays and Addresses | Sep 9, 2021 | Paperback | 9781013820625 |
| | Saint Teresa of Jesus, and Other Essays and Addresses | Sep 9, 2021 | Hardcover | 9781013495410 |
| 11 | Spirit of Flame, a Study of St. John of the Cross | Sep 9, 2021 | Paperback | 9781014076045 |
| | Spirit of Flame, a Study of St. John of the Cross | Jul 18, 2023 | Hardcover | 9781019350973 |
| 12 | Mother of Carmel, a Portrait of St. Teresa of Jesus | Sep 9, 2021 | Paperback | 9781014803559 |
| | Mother of Carmel, a Portrait of St. Teresa of Jesus | Sep 9, 2021 | Hardcover | 9781014091116 |
| 13 | The Mystics of Spain | Sep 9, 2021 | Paperback | 9781014891976 |
| | The Mystics of Spain | Sep 9, 2021 | Hardcover | 9781014143839 |
| 14 | Handbook to the Life and Times of St. Teresa and St. John of the Cross; 0 | Sep 10, 2021 | Paperback | 9781015172852 |
| | Handbook to the Life and Times of St. Teresa and St. John of the Cross 0 | Sep 9, 2021 | Hardcover | 9781014318176 |

152. The two editions listed under No. 4 in **Table 3**, titled *Saint Bernadette Soubirous, 1844-1879,* are the same literary work identified in **Table 1**, and alleged herein, as *Saint Bernadette Soubirous* (Work No. 4, *see* ¶¶ 63–74 above). This work has historically been published under variant title formulations, at times with the dates "1844–1879" appended and at other times without them. That variation in title does not identify or denote a different literary work.

153. The four editions listed under No. 7 in **Table 3** are all the same literary work identified in **Table 1**, and alleged herein, as *The Complete Works of Saint Teresa of Jesus* (Work No. 7). CMP published that Work in two sets of editions approximately two years apart: two editions on September 9, 2021, titled *The Complete Works of Saint Teresa of Jesus, Tr. and Ed. by E. Allison Peers From the Critical Ed. of P. Silverio De Santa Teresa* (the "**2021 Editions**"); and two editions on July 18, 2023, titled *The Complete Works of Saint Teresa of Jesus, Volume 1* (the "**2023 Editions**"). All four editions reproduce the same English-language translation by E. Allison Peers and do not identify or denote different literary works.

**(ii) Copyright Infringement – 17 U.S.C. § 501**

154. Without authorization, license, or consent from Plaintiff or any predecessor in title to the copyright in the Works, CMP reproduced, published, distributed, offered for sale, and sold the Infringing Works through the print-on-demand and wholesale distribution channels (as alleged in ¶143 above), beginning September 9, 2021.

155. Work No. 5 *(The Mother of the Saviour and Our Interior Life)* is an English-language translation of its underlying French work *La mère du Sauveur et notre vie intérieure*. Plaintiff's exclusive license to publish an English-language translation of that underlying French work (as alleged in ¶85 above) remained in effect through December 31, 2021. CMP's publication of Work No. 5 on September 9, 2021 therefore also occurred, and infringed Plaintiff's exclusive licensed right, during the term of that license.

156. Work No. 6 (*The Three Ways of the Spiritual Life)* is an English-language translation of its underlying French work *Les trois conversions et les trois voies*. Plaintiff's claims with respect to Work No. 6 are based on Plaintiff's exclusive license to publish an English-language translation of that underlying French work, which remained in effect through December 31, 2021 (as alleged in ¶97 above). CMP's publication of Work No. 6 on September 9, 2021 occurred during the term of that license and infringed Plaintiff's exclusive licensed right by reproducing protected expression of the underlying French work (as alleged in ¶104 above).

157. Ingram Content Group and Lightning Source LLC records indicate that CMP sold at least 628 copies of Work Nos. 1 through 3 between approximately September 2021 and February 2026, comprising 474 copies of Work No. 1 (*This Tremendous Lover)*, 141 copies of Work No. 2 *(Difficulties in Mental Prayer)*, and 13 copies of Work No. 3 *(A Mystic Under Arms)*. CMP's sales figures for Work Nos. 4 through 14 have not yet been determined and remain subject to discovery.

158. Through the purchases described in ¶23 above, Plaintiff's counsel obtained a copy of each of the Infringing Works. Documentary evidence of those purchases, including order confirmations, receipts, shipment and pickup records, and photographs of the books and their packaging showing the production labels identifying Lightning Source LLC as the manufacturer, is attached and incorporated hereto as **Exhibit 20**.

**(iii) Integrity of Copyright Management Information – 17 U.S.C. § 1202**

159. The back covers of each of the Infringing Works bear the following express statement: *"This work is in the public domain in the United States of America, and possibly other nations. Within the United States, you may freely copy and distribute this work, as no entity (individual or corporate) has a copyright on the body of the work." See* **Exhibit 20**.

160. That statement, read as a whole, constitutes copyright management information within the meaning of 17 U.S.C. § 1202(c)(6): it purports to state the terms and conditions for use

of the work with which it is conveyed, namely, that no copyright subsists in the work, that no person or entity holds any rights in it, and that the work may accordingly be freely copied and distributed without restriction, and it is conveyed in connection with copies of the work, appearing on the back cover of every copy of each Infringing Work. In the alternative, the statement's representation that no entity, individual or corporate, holds a copyright in the body of the work constitutes information about the copyright owner of the work within the meaning of 17 U.S.C. § 1202(c)(3), conveyed in connection with copies of the work in the same manner.

161. That copyright management information is false. Each of the Works is protected by copyright in the United States (as alleged in the title-by-title allegations above), all rights in each of the Works are held by Plaintiff as owner or exclusive licensee, and the Works may not be freely copied or distributed without authorization.

162. The back covers of the Infringing Works further state that "*This work has been selected by scholars as being culturally important*" and that "*Scholars believe, and we concur, that this work is important enough to be preserved.*"

163. Upon information and belief, no scholar selected the Works, and the statements identified in the preceding paragraph are false and standardized statements applied indiscriminately by CMP to the works it reproduced.

164. In addition to the false CMI appearing on the back covers of all of the Infringing Works, **<u>Table 4</u>** below identifies, for each of the Works, the copyright notice, if any, appearing in the source copy CMP used, and the copyright notice, if any, appearing in CMP's own edition.

(The remaining portion of this page is intentionally left blank.)

| TABLE 4 | | | |
|---|---|---|---|
| **Work No.** | **Title** | **© notice in original files** | **© notice inside CMP's edition** |
| 1 | This Tremendous Lover | Copyright, 1947, by The Newman Bookshop | none (removed) |
| 2 | Difficulties in Mental Prayer | ALL RIGHTS RESERVED MADE IN IRELAND | ALL RIGHTS RESERVED MADE IN IRELAND |
| 3 | A Mystic Under Arms | World copyright reserved. The Mercier Press Ltd., Cork | none (removed) |
| 4 | Saint Bernadette Soubirous, 1844-1879 | © Longmans, Green and Co., Ltd., London, 1957 | © Longmans, Green and Co., Ltd., London, 1957 |
| 5 | The Mother of the Saviour and Our Interior Life | none | none |
| 6 | The Three Ways of the Spiritual Life | none | none |
| 7 | The Complete Works of Saint Teresa of Jesus, Tr. and Ed. by E. Allison Peers From the Critical Ed. of P. Silverio De Santa Teresa (2021) | none | none |
| | The Complete Works of Saint Teresa of Jesus, Volume 1 (2023) | none | none |
| 8 | Spain, the Church and the Orders | none | none |
| 9 | Fool of Love: The Life of Ramon Lull | none | none |
| 10 | Saint Teresa of Jesus and Other Essays and Addresses | none | none |
| 11 | Spirit of Flame: A Study of St. John of the Cross | Copyright, 1944, by Morehouse-Gorham Co. | none (removed) |
| 12 | Mother of Carmel: A Portrait of St. Teresa of Jesus | Copyright, 1946, by Morehouse-Gorham Co. | none (removed) |
| 13 | The Mystics of Spain | This book is copyright under the Berne Convention. Apart from any fair dealing for the purposes of private study, research, criticism or review, as permitted under the Copyright Act 1911, no portion may be reproduced by any process without written permission. Enquiry should be made to the publisher. | none (removed) |
| 14 | A Handbook to the Life and Times of St. Teresa and St. John of the Cross | ALL RIGHTS RESERVED | ALL RIGHTS RESERVED |

165. Upon information and belief, CMP knowingly provided and caused to be distributed copies of the Infringing Works containing the false copyright management information described herein by supplying the infringing book files and causing them to be printed, manufactured, and distributed through print-on-demand and wholesale distribution channels.

166. Upon information and belief, CMP produced its editions of the Works from digitized library copies obtained through the Internet Archive (archive.org), which it packaged for print-on-demand manufacturing and distribution. Each such digitized source copy bears a library bookplate, shelf-mark, or other identifying mark linking it to a specific digitized file available through the Internet Archive.

167. Upon the closure of Marygrove College in Detroit in 2019, the entire collection of its Geschke Library was donated to the Internet Archive. The donated collection was digitized and made available online beginning in 2020 via the following URL, https://blog.archive.org/2019/12/10/preserving-the-legacy-of-a-library-when-a-college-closes/ (last visited July 26, 2026). Attached and incorporated hereto as **Exhibit 21** is a print-out of this Internet Archive webpage.

168. Upon information and belief, the digitized source copies from which CMP produced its editions, their Internet Archive identifiers, and the corresponding page-by-page comparison exhibits are identified in **Table 5** below.

169. The source copy identified in **Table 5** for Work No. 7 is the source copy for the 2021 Editions of that Work (as alleged in ¶153 above). The 2023 Editions of Work No. 7 bear no library markings, and no Internet Archive source copy for them has been identified; the 2023 Editions reproduce the 1946 publication of the E. Allison Peers translation, which did not carry a copyright notice.

| TABLE 5 | | | |
|---|---|---|---|
| **Work No.** | **Title** | **Archive.org Identifier** | **Comparison Exhibit** |
| 1 | This Tremendous Lover | thistremendouslo0000boyl | **Exhibit 22** |
| 2 | Difficulties in Mental Prayer | difficultiesinme0000boyl | **Exhibit 23** |
| 3 | A Mystic Under Arms | mysticunderarms0000boyl | **Exhibit 24** |
| 4 | Saint Bernadette Soubirous | saintbernadettes0000troc | **Exhibit 25** |
| 5 | The Mother of the Saviour and Our Interior Life | motherofsaviouro0000garr | **Exhibit 26** |
| 6 | The Three Ways of the Spiritual Life | threewaysofspiri00garr | **Exhibit 27** |
| 7 | The Complete Works of Saint Teresa of Jesus * | completeworksofs0001unse_g0w5 | **Exhibit 28** |
| 8 | Spain, the Church and the Orders | spainchurchorder0000peer | **Exhibit 29** |
| 9 | Fool of Love: The Life of Ramon Lull | fooloflove0000peer | **Exhibit 30** |
| 10 | Saint Teresa of Jesus and Other Essays and Addresses | saintteresaofjes0000peer | **Exhibit 31** |
| 11 | Spirit of Flame: A Study of St. John of the Cross | spiritofflamestu00peer | **Exhibit 32** |
| 12 | Mother of Carmel: A Portrait of St. Teresa of Jesus | motherofcarmelpo0000peer | **Exhibit 33** |
| 13 | The Mystics of Spain | mysticsofspain0000peer | **Exhibit 34** |
| 14 | A Handbook to the Life and Times of St. Teresa and St. John of the Cross | handbooktolifeti0000peer | **Exhibit 35** |

170. CMP's editions reproduce within the body of the books the same internal library bookplates, shelf-marks, and collection markings appearing in the digitized source copies identified in **Table 5**, demonstrating that CMP produced its editions from those copies. Each comparison exhibit identified in **Table 5** is a page-by-page comparison of the digitized source copy, as displayed on the Internet Archive, with the corresponding physical copy of CMP's edition purchased by Plaintiff's counsel.

171. A publisher exercising ordinary editorial review would not reproduce a library's internal bookplates and collection markings within a commercially distributed edition. Upon information and belief, the presence of such markings within CMP's editions supports the inference

that CMP reproduced the Works through an automated or substantially automated process, without meaningful human review.

**(iv) Removed Copyright Notices**

172. As reflected in **<u>Table 4</u>** above, the source copy from which CMP produced Work No. 1 (*This Tremendous Lover*) contained the copyright notice "Copyright, 1947, by The Newman Bookshop". CMP's edition of Work No. 1 omits that copyright page in its entirety, and that copyright notice does not appear anywhere in CMP's edition. *See* **Exhibit 22**.

173. As reflected in **<u>Table 4</u>** above, the source copy from which CMP produced Work No. 3 (*A Mystic Under Arms*) contained the copyright notice "World copyright reserved. The Mercier Press Ltd., Cork". CMP's edition of Work No. 3 omits that copyright page in its entirety, and that copyright notice does not appear anywhere in CMP's edition. *See* **Exhibit 24**.

174. As reflected in **<u>Table 4</u>** above, the source copy from which CMP produced Work No. 11 (*Spirit of Flame, a Study of St. John of the Cross*) contained the copyright notice "Copyright, 1944, by Morehouse-Gorham Co.". CMP's edition of Work No. 11 omits that copyright page in its entirety, and that copyright notice does not appear anywhere in CMP's edition. *See* **Exhibit 32**.

175. As reflected in **<u>Table 4</u>** above, the source copy from which CMP produced Work No. 12 (*Mother of Carmel, a Portrait of St. Teresa of Jesus*) contained the copyright notice "Copyright, 1946, by Morehouse-Gorham Co." CMP's edition of Work No. 12 omits that copyright page in its entirety, and that copyright notice does not appear anywhere in CMP's edition. *See* **Exhibit 33**.

176. As reflected in **<u>Table 4</u>** above, the source copy from which CMP produced Work No. 13 (*The Mystics of Spain*) contained the copyright notice "This book is copyright under the Berne Convention. Apart from any fair dealing for the purposes of private study, research, criticism or review, as permitted under the Copyright Act 1911, no portion may be reproduced by any

process without written permission. Enquiry should be made to the publisher." CMP's edition of Work No. 13 omits that copyright page in its entirety, and that copyright notice does not appear anywhere in CMP's edition. *See* **Exhibit 34**.

**(v) Retained Copyright Notices**

177. As reflected in **Table 4** above, CMP's edition of Work No. 2 (*Difficulties in Mental Prayer*) retains, on its title page (page iii), the copyright management information "ALL RIGHTS RESERVED. MADE IN IRELAND". *See* **Exhibit 23**.

178. As reflected in **Table 4** above, CMP's edition of Work No. 4 (*Saint Bernadette Soubirous*) retains, at page iv, the copyright management information "© Longmans, Green and Co., Ltd., London, 1957." *See* **Exhibit 25**.

179. As reflected in **Table 4** above, CMP's edition of Work No. 14 (*A Handbook to the Life and Times of St. Teresa and St. John of the Cross*) retains, at page iv, the copyright management information "ALL RIGHTS RESERVED." *See* **Exhibit 35**.

180. Each copyright management notice that CMP's editions retained, as alleged above, directly contradicts the false CMI appearing on the back cover of that same edition, which represents that the work is in the public domain and may be freely copied and distributed without restriction (as alleged in ¶¶159–160 above).

**(vi) Source Copies Bearing No Copyright Notice**

181. As reflected in **Table 4** above, the source copies of Work No. 5 (*The Mother of the Saviour and Our Interior Life*), Work No. 6 (*The Three Ways of the Spiritual Life*), Work No. 8 (*Spain, the Church and the Orders*), Work No. 9 (*Fool of Love: The Life of Ramon Lull*), and Work No. 10 (*Saint Teresa of Jesus and Other Essays and Addresses*) bore no copyright notice, and CMP's editions of those Works likewise bear no copyright notice. As further reflected in **Table 4** above, the source copy for the 2021 Editions of Work No. 7 bore no copyright notice, and the 2023

Editions of Work No. 7 likewise bear no copyright notice, consistent with the absence of any copyright notice in the 1946 publication of the E. Allison Peers translation (as alleged in ¶169 above).

182. With respect to those Works, the only copyright management information appearing on CMP's editions is the false CMI on the back cover (as alleged in ¶159 above): "*This work is in the public domain in the United States of America, and possibly other nations. Within the United States, you may freely copy and distribute this work, as no entity (individual or corporate) has a copyright on the body of the work.*"

**(vii) Pattern and Mechanism of Removal**

183. A consistent pattern appears across CMP's editions. Each source-copy notice that CMP omitted from its editions contains the word "copyright": the notices in Work No. 1 (*This Tremendous Lover*), Work No. 3 (*A Mystic Under Arms*), Work No. 11 (*Spirit of Flame*), Work No. 12 (*Mother of Carmel*), and Work No. 13 (*The Mystics of Spain*). By contrast, each notice that CMP's editions retained does not contain that word: "ALL RIGHTS RESERVED. MADE IN IRELAND" in Work No. 2, "© Longmans, Green and Co., Ltd., London, 1957" in Work No. 4, and "ALL RIGHTS RESERVED" in Work No. 14.

184. Pages that were blank in the source copies are reproduced in CMP's editions as gray rectangles bearing the scanned texture of the source page. The pages omitted from CMP's editions are instead replaced by undifferentiated white pages, preserving each book's pagination, indicating that the omitted pages were removed and replaced rather than lost in reproduction. Upon information and belief, the pattern of removal and retention alleged above reflects that CMP's automated publishing pipeline was configured, whether by keyword-based page filtering, by page selection, or otherwise, to identify and omit pages bearing copyright notices.

### (viii) ONIX Feed of False Copyright Management Information

185. ONIX ("**ONline Information eXchange**") is the standard electronic metadata format used throughout the book publishing and distribution industry, including by Ingram Content Group and Lightning Source LLC, to transmit book information, including titles, descriptions, and other product data, to retailers and other trading partners, as described at https://www.ingramcontent.com/retailers-blog/metadata-for-books-the-current-landscape (last visited July 1, 2026).

186. Upon information and belief, CMP embedded the false CMI (as alleged in ¶¶159–161 above), verbatim, within the product description ("**blurb**") field of the ONIX metadata record for each of the Infringing Works. That field is ordinarily used by publishers to describe a book's subject matter or content to prospective purchasers; it is not a field in which publishers customarily make representations concerning a work's copyright status

187. Upon information and belief, CMP transmitted those ONIX metadata records, containing the false CMI, to Ingram Content Group and Lightning Source LLC for distribution to retailers, independent of whether any particular retailer purchased a copy of the Infringing Works.

188. Because the false CMI was embedded in the product description field, it was displayed automatically on the retail listing page for each Infringing Work. Unlike a copyright notice printed within the pages of a book, which is visible only to a person who has already purchased a physical copy, the false CMI was visible to any person who viewed that listing, regardless of whether that person purchased, or ever intended to purchase, a copy of the work. The identical statement, verbatim, appears in retail listings for the Infringing Works across multiple independent retailers, demonstrating that it originated from a single common source rather than being independently supplied by each retailer. Attached and incorporated hereto as **Exhibit 36** are examples of such retail listings for the Infringing Works from multiple independent retailers.

189. Through Ingram Content Group's wholesale distribution, the Infringing Works were purchased by numerous downstream retailers, including Amazon, Walmart, Waterstones, Barnes & Noble, Indigo, and Bookshop.org, among others, as reflected in records produced by Ingram Content Group.

190. Records produced by Ingram Content Group reflect that at least fifty retailers purchased and offered certain of the Infringing Works for sale through the ONIX feed described herein. Upon information and belief, the feed itself, and the false CMI it carried, reached a substantially larger number of retailers beyond those reflected in Ingram's own purchase records.

191. Upon information and belief, retail listings bearing the false CMI remain publicly accessible indefinitely, including through secondary and used-book marketplaces, and continue to be viewed by prospective purchasers independent of, and long after, any particular sale.

192. Upon information and belief, by using the identical false statement on every one of the more than 500,000 titles CMP has published (as alleged in ¶119 above), CMP has caused its own name and imprints to become associated, in the minds of consumers and retailers, with reprints represented to be in the public domain, such that a person encountering any CMP-published title reasonably assumes, based on CMP's own established and repeated pattern of representations, that the work is in the public domain.

193. By this means, the false CMI was disseminated by CMP to retailers and prospective purchasers through multiple retail channels, independent of and regardless of whether any particular retailer purchased a copy.

**(ix) <u>Discovery of the Infringement</u>**

194. Plaintiff first discovered CMP's unauthorized publication of the Works, and the false CMI disseminated in connection with them, on or about January 7, 2026, in the course of

investigating potential unauthorized publication of Plaintiff's exclusively licensed and copyrighted works by third parties.

195. That investigation led Plaintiff to a retail listing on Walmart.com offering for sale a hardcover edition of Work. No.1 *This Tremendous Lover* bearing ISBN 9781014095091, the same ISBN identified in **Table 3** above as one of CMP's infringing editions of that Work.

196. Plaintiff's further investigation, prompted by that discovery, revealed that CMP had also published, through its imprints, including Hassell Street Press, unauthorized editions of additional works in which Plaintiff then held rights. Plaintiff's original Verified Complaint, filed February 11, 2026, concerned three of the Works (Work Nos. 1 through 3).

197. On February 16, 2026, Plaintiff moved for leave to conduct early discovery to identify the responsible party. The Court granted that motion in part on April 10, 2026, authorizing a Rule 45 subpoena to Lightning Source LLC, which Plaintiff served on April 13, 2026, and on April 24, 2026 Lightning Source LLC identified CMP as the responsible account holder. Upon identifying CMP and investigating its conduct, Plaintiff discovered that four further works in which it held rights (Work Nos. 4 through 7) had likewise been reproduced and offered for sale by CMP, and Plaintiff added those works by its First Amended Verified Complaint.

198. Infringing Work Nos. 1 through 3 had already ceased to be available in or about February 2026, before the subpoena was served on Lightning Source LLC and before CMP was identified as the responsible account holder (as alleged above). Upon information and belief, those editions were placed on hold, removed, or suspended by Ingram Content Group or Lightning Source LLC, and not by any voluntary act of CMP. Holt's later assertion, in his April 21, 2026 communication, that he had directed their removal (as alleged in ¶17 above) postdated the removal and did not cause it. The circumstances of the removal remain within the knowledge of Defendants, Ingram Content Group, and Lightning Source LLC.

199. After acquiring the copyrights in an additional twenty-two works of E. Allison Peers, including Work Nos. 8 through 14 (as alleged in ¶109 above), Plaintiff then determined that CMP had likewise reproduced and offered for sale unauthorized editions of each of Work Nos. 8 through 14. Plaintiff adds those Works by this Second Amended Verified Complaint.

200. Plaintiff is a small publisher, organized under the laws of the Isle of Man, specializing in traditional Catholic books (as alleged in ¶13 above), and its business is conducted primarily within the specialty traditional Catholic publishing and bookselling market. CMP, by contrast, is not a participant in that specialty market, and instead publishes and distributes its editions, including the Infringing Works, through general-interest, mass-market retail and wholesale channels, including Amazon, Walmart, Barnes & Noble, and the other retailers identified in ¶189 above.

201. Those general retail and wholesale channels collectively offer for sale several million individual book titles. Given that volume, and the specialty nature of Plaintiff's own market, Plaintiff does not, and could not practically, conduct routine or systematic searches of those channels for unauthorized editions of its backlist titles. Plaintiff could not, through the exercise of reasonable diligence, have discovered CMP's infringing conduct earlier than as alleged herein.

202. Independent of the foregoing, each sale of an Infringing Work, and each transmission of false copyright management information, occurring within the three years preceding the commencement of this action constitutes a separately accruing act of infringement or violation that is independently timely, without regard to the date on which Plaintiff discovered CMP's conduct. CMP's sales and transmissions have continued throughout that period, including sales of Work Nos. 1 through 3 continuing through at least February 2026 (as alleged in ¶157 above), and, upon information and belief, sales and transmissions of the remaining Works, the full extent of which remains subject to discovery.

**FIRST CLAIM FOR RELIEF**
**COPYRIGHT INFRINGEMENT (17 U.S.C. §§ 106 and 501)**

203. Plaintiff repeats and realleges all preceding paragraphs as if fully set forth herein.

204. Plaintiff holds the copyright in, or the exclusive right to exploit, each of the Works (as alleged in **Table 1** and ¶¶33–118 above). Those rights comprise the three categories alleged below, and certain Works fall into more than one category.

205. First, Plaintiff holds the copyright in, or exclusive rights directly in, original English-language works: Work Nos. 1 through 3 and Work Nos. 8 through 12, and Work No. 14.

206. Second, Plaintiff owns all rights in English-language works that are translations of foreign-language originals: Work Nos. 4, 5, 7 and 13.

207. Third, with respect to Work Nos. 5 and 6, Plaintiff held an exclusive license, granted by the Dominican Province of France, to publish an English-language translation of the underlying French works from which those two Works were translated, in effect from January 4, 2016 through December 31, 2021.

208. Plaintiff's rights in Work Nos. 3 and 8 through 14 include all accrued causes of action for infringement occurring before the date of Plaintiff's acquisition of those rights, as alleged in the title-by-title allegations above (including ¶¶56 and 109).

209. CMP had access to each of the Works, including through the digitized source copies from which CMP produced its editions (as alleged in ¶¶166–186 above).

210. Without authorization, license, or consent from Plaintiff or any predecessor in title to the copyright in the Works, CMP infringed Plaintiff's exclusive rights in the Works by reproducing, distributing, offering for sale, and selling unauthorized and infringing copies of the Works, in violation of 17 U.S.C. §§ 106 and 501 (as alleged in ¶¶149–157 and 166–186 above).

211. With respect to Work Nos. 5 and 6, CMP's publication of those Works on September 9, 2021 further infringed Plaintiff's exclusive rights to publish English-language translations of the underlying French works, which remained in effect through December 31, 2021 (as alleged in ¶¶85, 97, and 155–156 above).

212. Upon information and belief, CMP's infringing acts were committed willfully, or, at a minimum, with reckless disregard for Plaintiff's rights.

213. Upon information and belief, Holt, Roskill, and Youmans directed, controlled, and personally participated in CMP's reproduction, distribution, and sale of the Infringing Works alleged in this First Claim for Relief (as alleged in ¶¶145–150 above), and each is personally liable, jointly and severally with CMP, for the infringement alleged herein.

214. Upon information and belief, Holt committed that infringement willfully, or, at a minimum, with reckless disregard for Plaintiff's rights, because he personally directed CMP's decision to reproduce and republish the Works without securing or verifying any license, permission, or public-domain determination for them, notwithstanding his legal training (as alleged in ¶¶125 and 146 above)

215. Upon information and belief, Roskill committed that infringement willfully, or, at a minimum, with reckless disregard for Plaintiff's rights, because he directed and controlled the very distribution accounts and channels through which the Infringing Works were manufactured, distributed, and sold (as alleged in ¶147 above).

216. Upon information and belief, Youmans committed that infringement willfully, or, at a minimum, with reckless disregard for Plaintiff's rights, because, notwithstanding his and his co-Defendants' decades of experience in the print-on-demand publishing industry (as described in ¶¶123–131 above), he designed, built, and controlled an automated pipeline that reproduced the

Works without meaningful review of their copyright status (as alleged in ¶¶120, 129, 135 and 148 above).

217. The registration requirement of 17 U.S.C. § 411(a) does not apply to Plaintiff's claims because each of the Works is a foreign work whose country of origin is not the United States, and none is a "United States work" within the meaning of 17 U.S.C. § 101 (as alleged in the title-by-title allegations above).

218. Work Nos. 1 and 2 are registered with the United States Copyright Office under Registration Nos. TX0005795374 and TX0005795333, respectively, each of which was registered before CMP's infringement of those Works began (as alleged in ¶¶44 and 53 above).

219. Plaintiff is therefore entitled to elect to recover statutory damages for CMP's infringement of Work Nos. 1 and 2 pursuant to 17 U.S.C. § 504(c). Plaintiff seeks to recover those damages from each Defendant ultimately found liable for one or more violations of 17 U.S.C. §§ 106 and 501, consistent with the nature and extent of each Defendant's liability as determined by the Court and applicable law.

220. Work Nos. 3, 4, 7, 8, 9, 10, 11, 12, 13, and 14 are not registered with the United States Copyright Office. With respect to those Works, Plaintiff is entitled to recover its actual damages and CMP's profits attributable to the infringement pursuant to 17 U.S.C. § 504(b).

221. Work No. 5, as an English-language work, is not registered with the United States Copyright Office, and, to that extent, Plaintiff is entitled to recover actual damages and CMP's profits attributable to CMP's infringement of that Work pursuant to 17 U.S.C. § 504(b).

222. In the alternative, to the extent CMP's infringement is based on Plaintiff's exclusive right to publish an English-language translation of the underlying French work for Work No. 5 (*La mère du Sauveur et notre vie intérieure)*, which is registered with the United States Copyright Office under Registration No. VA0001437200 (as alleged in ¶91 above), Plaintiff contends that it

is entitled to elect to recover statutory damages for CMP's infringement of that exclusive right pursuant to 17 U.S.C. § 504(c). Plaintiff seeks to recover statutory damages from each Defendant ultimately found liable for one or more violations of 17 U.S.C. §§ 106 and 501, consistent with the nature and extent of each Defendant's liability as determined by the Court and applicable law.

223. With respect to Work No. 6, Plaintiff's claim is based on its exclusive right to publish an English-language translation of the underlying French work (*Les trois conversions et les trois voies),* as alleged in ¶¶95 and 97 above, and Plaintiff is entitled to recover actual damages and CMP's profits attributable to CMP's infringement of that exclusive right pursuant to 17 U.S.C. § 504(b). In the alternative, because that underlying French work is registered with the United States Copyright Office under Registration No. VA0001437202 (as alleged in ¶103 above), effective before CMP's infringement began, Plaintiff contends that it is entitled to elect to recover statutory damages for CMP's infringement of that licensed right pursuant to 17 U.S.C. § 504(c). Under either damages election made by Plaintiff, Plaintiff seeks to recover those damages from each Defendant ultimately found liable for one or more violations of 17 U.S.C. §§ 106 and 501, consistent with the nature and extent of each Defendant's liability as determined by the Court and applicable law.

224. Plaintiff has been injured as a direct and proximate result of CMP's copyright infringement.

225. In addition, CMP has been unjustly enriched by its unauthorized reproduction, distribution, offering for sale, and sale of infringing copies of the Works, and Plaintiff is entitled to recover CMP's profits attributable to that infringement pursuant to 17 U.S.C. § 504(b).

226. CMP's copyright infringement has caused, and continues to cause, irreparable harm to Plaintiff, including loss of control over the Works and interference with Plaintiff's exclusive rights therein.

227. Infringing Work Nos. 1 through 3 ceased to be available for sale through Ingram Content Group and Lightning Source LLC in or about February 2026. Upon information and belief, the circumstances in which those editions ceased to be available, including whether they were withdrawn by CMP or suspended by Ingram Content Group or Lightning Source LLC, are matters within the knowledge of Defendants, Ingram Content Group and Lightning Source LLC. The remaining Infringing Works continue to be offered for sale through the retail and wholesale channels alleged herein, notwithstanding the commencement of this action on February 11, 2026.

228. Plaintiff accordingly lacks assurance that the infringing conduct will cease, or will not recur, absent injunctive relief. CMP's automated publishing pipeline remains in operation, its catalog of purportedly public-domain reprints remains offered for sale, and retail and secondary-market listings bearing the false CMI remain publicly accessible (as alleged in ¶191 above). The removal of Infringing Work Nos. 1 through 3 in or about February 2026 was not a voluntary act of CMP and constitutes no binding undertaking against resumption (as alleged in ¶198 above). Nothing prevents Defendants from resuming distribution of those editions through Ingram Content Group and Lightning Source LLC or any other distributor.

229. The infringing conduct will continue absent injunctive relief. CMP's infringing editions remain available for print-on-demand manufacture and distribution through Ingram Content Group and Lightning Source LLC, and will continue to be printed, sold, and distributed on demand unless Defendants are enjoined.

## SECOND CLAIM FOR RELIEF
## FALSE COPYRIGHT MANAGEMENT INFORMATION — THE INFRINGING WORKS (17 U.S.C. § 1202(a))

230. Plaintiff repeats and realleges all preceding paragraphs as if fully set forth herein.

231. The Infringing Works contain, on their back covers, false copyright management information within the meaning of 17 U.S.C. § 1202(c) (as alleged in ¶¶159–161 above).

232. As alleged herein, CMP knowingly provided that false copyright management information, and knowingly distributed, and caused to be distributed, copies of the Infringing Works containing it.

233. Upon information and belief, CMP provided and distributed the false copyright management information with the intent to induce, enable, facilitate, or conceal infringement of the Works, including by falsely representing that the Works were in the public domain and could be freely copied and distributed, thereby facilitating the unauthorized copying and distribution of the Works. The intent to induce, enable, facilitate, or conceal infringement is evident from the function of the statement itself: it expressly grants permission to 'freely copy and distribute' each Work; it enabled and facilitated CMP's own reproduction, distribution, and sale of the Infringing Works by representing to retailers and prospective purchasers that no rights stood in the way of those sales; and it concealed CMP's infringement by denying the existence of the very copyrights CMP was infringing, deflecting the scrutiny of rightsholders, retailers, and purchasers that would otherwise have revealed CMP's conduct.

234. CMP's knowledge of the falsity of the copyright management information, and its intent to induce, enable, facilitate, or conceal infringement, are evidenced by, among other things: the contradictory copyright management information appearing within CMP's own editions of Work Nos. 2, 4, and 14 (as alleged in ¶¶177–180 above); the false and standardized statements that the Works had been "selected by scholars as being culturally important" (as alleged in ¶¶162–163 above); and CMP's reproduction of the Works through an automated process without meaningful human review (as alleged in ¶¶170–171 above).

235. Upon information and belief, Holt, Roskill, and Youmans directed, controlled, and personally participated in CMP's provision and distribution of the false copyright management information appearing on the Infringing Works alleged in this Second Claim for Relief (as set forth in ¶¶145–149 above), and each is personally liable, jointly and severally with CMP, for the violations of 17 U.S.C. § 1202(a) alleged herein.

236. Upon information and belief, Holt knew that the copyright management information described herein was false, and directed, authorized, or knowingly permitted CMP's provision and distribution of that false information with the intent to induce, enable, facilitate, or conceal infringement of the Works, because he personally directed the republication of the Works from which that false information originated (as alleged in ¶146 above), and because, by virtue of his legal training (as alleged in ¶125 above), Holt understood that a categorical representation that a work is in the public domain and that no entity holds a copyright in it is a legal conclusion that cannot truthfully be made without verifying that work's copyright and restoration status, verification that CMP did not perform (as alleged in ¶¶132–136 above); and because the evident function of the statement he directed, authorized, or knowingly permitted CMP to disseminate was to authorize copying of the Works and to conceal CMP's lack of rights in them (as alleged in ¶233 above).

237. Upon information and belief, Roskill knew that the copyright management information described herein was false, and directed, authorized, or knowingly permitted CMP's provision and distribution of that false information with the intent to induce, enable, facilitate, or conceal infringement of the Works, because he directed and controlled the distribution accounts and channels through which that false information was transmitted to retailers and distributors (as alleged in ¶147 above), and because the evident function of the statement he directed, authorized,

or knowingly permitted CMP to disseminate was to authorize copying of the Works and to conceal CMP's lack of rights in them (as alleged in ¶233 above).

238. Upon information and belief, Youmans knew that the copyright management information described herein was false, and directed, authorized, or knowingly permitted CMP's provision and distribution of that false information with the intent to induce, enable, facilitate, or conceal infringement of the Works, because he designed, built, and controlled the automated pipeline that generated and applied that false information to the Works, and did so without configuring that pipeline to perform any meaningful verification of the copyright status or provenance of the material it processed (as alleged in ¶¶120, 129, 135 and 148 above), and because the evident function of the statement he directed, authorized, or knowingly permitted CMP to disseminate was to authorize copying of the Works and to conceal CMP's lack of rights in them (as alleged in ¶233 above).

239. CMP sold at least 628 copies of Work Nos. 1 through 3 (as alleged in ¶157 above), and each such copy constituted a separate act of providing and distributing false copyright management information in violation of 17 U.S.C. § 1202(a). The full extent of CMP's sales of the Infringing Works, including Work Nos. 4 through 14, remains subject to discovery, and Plaintiff reserves the right to prove additional violations at trial.

240. CMP published Work No. 7 under two different titles and two different ISBN pairs (as alleged in ¶153 above). For purposes of 17 U.S.C. § 1202(a), each of the four ISBN-assigned editions comprising those two publications generated independent copies sold, and therefore constitutes a separate source of violations under the counting theory (as alleged in ¶239 above), notwithstanding that Work No. 7 is treated as a single work for purposes of the First Claim for Relief.

241. Plaintiff has been injured as a direct and proximate result of CMP's violations of 17 U.S.C. § 1202(a) and is entitled to all available relief under the Copyright Act and the Digital Millennium Copyright Act.

242. Pursuant to 17 U.S.C. § 1203(c)(3)(B), Plaintiff is entitled, at its election, to recover statutory damages for each violation of 17 U.S.C. § 1202(a) in an amount of not less than $2,500 and not more than $25,000 per violation. Plaintiff seeks such statutory damages against each Defendant found liable for one or more violations of 17 U.S.C. § 1202(a), whether such liability is determined to be joint and several or individual, to the fullest extent permitted by applicable law.

**THIRD CLAIM FOR RELIEF**
**FALSE COPYRIGHT MANAGEMENT INFORMATION —**
**THE ONIX FEED (17 U.S.C. § 1202(a))**

243. Plaintiff repeats and realleges all preceding paragraphs as if fully set forth herein.

244. CMP embedded the false statement (as alleged in ¶¶159–161 above) within the product description field of the ONIX metadata for each of the Infringing Works, and that false statement was transmitted to retailers and displayed on retail listing pages independent of, and regardless of, whether any particular retailer purchased a copy of the relevant Infringing Work (as alleged in ¶¶186–188 above).

245. CMP knowingly transmitted that false copyright management information as part of the ONIX metadata records CMP provided to Ingram Content Group and Lightning Source LLC for distribution to retailers (as alleged in ¶¶186–187 above).

246. Upon information and belief, CMP transmitted the false copyright management information with the intent to induce, enable, facilitate, or conceal infringement of the Works, including by causing retailers and prospective purchasers to believe, before any purchase occurred, that the Works were in the public domain and could be freely copied and distributed (as alleged in

¶¶188–192 above). The intent is evident from the function of the transmitted statement itself (as alleged in ¶233 above), and the ONIX transmissions did that work before any sale occurred: each delivery placed the permission-granting, rights-denying statement before retailers and prospective purchasers at the moment of purchasing decision.

247. Upon information and belief, Holt, Roskill, and Youmans directed, controlled, and personally participated in CMP's transmission of false copyright management information through the ONIX metadata feed alleged in this Third Claim for Relief (as set forth in ¶¶145–149 above), and each is personally liable, jointly and severally with CMP, for the violations of 17 U.S.C. § 1202(a) alleged herein.

248. Upon information and belief, Holt knew that the copyright management information transmitted through the ONIX metadata feed was false, and directed, authorized, or knowingly permitted CMP's transmission of that false information with the intent to induce, enable, facilitate, or conceal infringement of the Works, because he personally directed the republication of the Works giving rise to the ONIX metadata transmitted for them (as alleged in ¶146 above), and because, by virtue of his legal training (as alleged in ¶125 above), Holt understood that a categorical representation that a work is in the public domain and that no entity holds a copyright in it is a legal conclusion that cannot truthfully be made without verifying that work's copyright and restoration status, verification that CMP did not perform (as alleged in ¶¶132–136 above); and because the evident function of the statement he directed, authorized, or knowingly permitted CMP to disseminate was to authorize copying of the Works and to conceal CMP's lack of rights in them (as alleged in ¶¶233 and 246 above).

249. Upon information and belief, Roskill knew that the copyright management information transmitted through the ONIX metadata feed was false, and directed, authorized, or knowingly permitted CMP's transmission of that false information with the intent to induce, enable,

facilitate, or conceal infringement of the Works, because he directed and controlled the very ONIX metadata feed and distribution accounts through which that false information was transmitted (as alleged in ¶147 above), and because the evident function of the statement he directed, authorized, or knowingly permitted CMP to disseminate was to authorize copying of the Works and to conceal CMP's lack of rights in them (as alleged in ¶¶233 and 246 above).

250. Upon information and belief, Youmans knew that the copyright management information transmitted through the ONIX metadata feed was false, and directed, authorized, or knowingly permitted CMP's transmission of that false information with the intent to induce, enable, facilitate, or conceal infringement of the Works, because he designed, built, and controlled the automated pipeline that generated that false information for transmission, without configuring that pipeline to perform any meaningful verification of the copyright status or provenance of the material it processed (as alleged in ¶¶120, 129, 135, and 148 above), and because the evident function of the statement he directed, authorized, or knowingly permitted CMP to disseminate was to authorize copying of the Works and to conceal CMP's lack of rights in them (as alleged in ¶¶233 and 246 above).

251. Independent of, and in addition to, any copies sold, CMP's delivery of the ONIX metadata record containing the false copyright management information constituted a separate act of providing false copyright management information under 17 U.S.C. § 1202(a) for each ISBN-assigned edition of the Infringing Works, as to each retailer that received the record for that edition. For the avoidance of doubt, Plaintiff alleges one violation per ISBN-assigned edition per receiving retailer, and not a separate violation for each refresh or retransmission of the feed carrying that record. Each such delivery provided the false CMI to a recipient whose purpose in receiving it was to display it to prospective purchasers. Each such delivery was made pursuant to, and as part of, the same knowing provision of false copyright management information alleged herein; the number

of violations measures the acts of provision, not separate mental states. In the alternative, and at a minimum, each of the thirty ISBN-assigned editions for which CMP provided false copyright management information constitutes at least one violation of 17 U.S.C. § 1202(a).

252. Upon information and belief, the ONIX metadata record for each ISBN-assigned edition was delivered independently to, and processed independently by, each retailer subscribing to the feed carrying that record, with each such retailer generating from that record a product listing displaying the false copyright management information. The number of retailers receiving the record for any given ISBN-assigned edition may vary by edition, and the precise number of violations will be established through discovery of CMP's and its distributors' feed-subscription and transmission records.

253. Records produced by Ingram Content Group reflect that at least fifty retailers received the false copyright management information through that feed; upon information and belief, the feed reached a substantially larger number of retailers beyond those reflected in Ingram's records (as alleged in ¶190 above).

254. CMP published Work No. 7 under two different titles and two different ISBN pairs (as alleged in ¶153 above). For purposes of 17 U.S.C. § 1202(a), each of the four ISBN-assigned editions comprising those two publications generated independent ONIX record deliveries, and therefore constitutes a separate source of violations (as alleged in ¶251 above), notwithstanding that Work No. 7 is treated as a single work for purposes of the First Claim for Relief.

255. Plaintiff has been injured as a direct and proximate result of CMP's violations of 17 U.S.C. § 1202(a) and is entitled to all available relief under the Copyright Act and the Digital Millennium Copyright Act.

256. Pursuant to 17 U.S.C. § 1203(c)(3)(B), Plaintiff is entitled to elect to recover statutory damages for each violation of 17 U.S.C. § 1202 in an amount of not less than $2,500 and

not more than $25,000 per violation. Plaintiff seeks such statutory damages against each Defendant found liable for one or more violations of 17 U.S.C. § 1202(a), whether such liability is determined to be joint and several or individual, to the fullest extent permitted by applicable law.

**FOURTH CLAIM FOR RELIEF**
**REMOVAL OF COPYRIGHT MANAGEMENT INFORMATION (17 U.S.C. § 1202(b))**

257. Plaintiff repeats and realleges all preceding paragraphs as if fully set forth herein.

258. The source copies of Work Nos. 1, 3, 11, 12, and 13 each contained copyright management information within the meaning of 17 U.S.C. § 1202(c) (as alleged in ¶¶172–176 above).

259. CMP's infringing editions of Work Nos. 1, 3, 11, 12, and 13 omit that copyright management information in its entirety (as alleged in ¶¶172–176 above).

260. Upon information and belief, CMP intentionally removed that copyright management information, without the authority of the copyright owner or of Plaintiff, in the course of reproducing and distributing its infringing editions of Work Nos. 1, 3, 11, 12, and 13 (as alleged in ¶¶172–176 above).

261. The precise mechanism by which the copyright pages of Work Nos. 1, 3, 11, 12, and 13 came to be omitted from CMP's editions, whether by configuration of CMP's automated pipeline, by page selection, or otherwise, is a matter uniquely within Defendants' possession, custody, and control. Whatever the mechanism, the source copies contained those pages; CMP's process reproduced the surrounding contents of those source copies faithfully, down to their library bookplates and collection markings; and the pages omitted were precisely those bearing the copyright notices identified in **Table 4** above. The pattern and mechanism of that removal are further alleged in ¶¶183–184 above.

262. Upon information and belief, CMP distributed copies of its infringing editions of Work Nos. 1, 3, 11, 12, and 13 knowing that the copyright management information described herein had been removed without authority.

263. Upon information and belief, CMP removed, and distributed copies knowing that the copyright management information had been removed, with knowledge, or with reasonable grounds to know, that doing so would induce, enable, facilitate, or conceal infringement of the rights protected under the Copyright Act, including by permitting CMP to represent, through the false statement (as alleged in ¶159 above), that the Works were in the public domain and could be freely copied and distributed. That knowledge and intent are further evidenced by the pattern of removal and retention, and by the mechanism of removal and replacement (as alleged in ¶¶183–184 above): pages containing the word "copyright" were removed and replaced with blank pages, while notices lacking that word were retained.

264. Upon information and belief, Holt, Roskill, and Youmans directed, controlled, and personally participated in CMP's removal of copyright management information from Work Nos. 1, 3, 11, 12, and 13 alleged in this Fourth Claim for Relief (as set forth in ¶¶145–149 above), and each is personally liable, jointly and severally with CMP, for the violations of 17 U.S.C. § 1202(b) alleged herein.

265. Upon information and belief, Holt knew, or had reasonable grounds to know, that CMP's removal of copyright management information from Work Nos. 1, 3, 11, 12, and 13 would induce, enable, facilitate, or conceal infringement of the rights protected under the Copyright Act, and directed, authorized, or knowingly permitted that removal, because he personally directed the republication of those Works from which that information was removed (as alleged in ¶146 above).

266. Upon information and belief, Roskill knew, or had reasonable grounds to know, that CMP's removal of copyright management information from Work Nos. 1, 3, 11, 12, and 13 would

induce, enable, facilitate, or conceal infringement of the rights protected under the Copyright Act, and directed, authorized, or knowingly permitted that removal, because he directed and controlled the distribution accounts and channels through which the resulting copies, stripped of that information, were manufactured, distributed, and sold (as alleged in ¶147 above).

267. Upon information and belief, Youmans knew, or had reasonable grounds to know, that CMP's removal of copyright management information from Work Nos. 1, 3, 11, 12, and 13 would induce, enable, facilitate, or conceal infringement of the rights protected under the Copyright Act, and directed, authorized, or knowingly permitted that removal, because he designed, built, and controlled the automated pipeline that removed that information during reproduction, without configuring that pipeline to perform any meaningful verification of the copyright status or provenance of the material it processed (as alleged in ¶¶120, 129, 135 and 148 above), and because, upon information and belief, that pipeline was configured to identify and omit pages bearing copyright notices (as alleged in ¶¶183–184 above).

268. CMP sold at least 474 copies of Work No. 1 (*This Tremendous Lover)* and 13 copies of Work No. 3 (*A Mystic Under Arms)* (as alleged in ¶158 above), and each such copy constituted a separate act of distributing copyright management information knowing it had been removed, in violation of 17 U.S.C. § 1202(b). CMP's sales of Work Nos. 11, 12, and 13 have not yet been determined and remain subject to discovery, and each such copy likewise constitutes a separate violation. The full extent of CMP's sales of those Works remains subject to discovery, and Plaintiff reserves the right to prove additional violations at trial.

269. Plaintiff has been injured as a direct and proximate result of CMP's violations of 17 U.S.C. § 1202(b) and is entitled to all available relief under the Copyright Act and the Digital Millennium Copyright Act.

270. Pursuant to 17 U.S.C. § 1203(c)(3)(B), Plaintiff is entitled to elect to recover statutory damages for each violation of 17 U.S.C. § 1202(b) in an amount of not less than $2,500 and not more than $25,000 per violation. Plaintiff seeks such statutory damages against each Defendant found liable for one or more violations of 17 U.S.C. § 1202(b), whether such liability is determined to be joint and several or individual, to the fullest extent permitted by applicable law.

**PRAYER FOR RELIEF; JURY DEMAND**

WHEREFORE, for the reasons set forth above, Plaintiff respectfully prays that the Court enter judgment against Defendants, including but not limited to, each of the individual Defendants, personally liable, and jointly and severally with Defendant CMP, as follows:

1. A preliminary and permanent injunction enjoining and restraining Defendants, and all persons acting in concert or participation with Defendants, from reproducing, distributing, offering for sale, selling, creating derivative works from, or otherwise exploiting the Works without authorization, including by means of any digital files of the Works in Defendants' possession, custody, or control;

2. An order requiring Defendants to account for and disgorge all profits derived from their infringement of the Works;

3. An award of actual damages and Defendants' profits and, where available, statutory damages pursuant to 17 U.S.C. § 504, including statutory damages for willful copyright infringement where available, as alleged in the First Claim for Relief;

4. As prescribed and permitted under the DMCA and consistent with the remedial and deterrent policies of the DMCA, an award of statutory damages pursuant to 17 U.S.C. § 1203(c)(3)(B) for each violation of 17 U.S.C. § 1202(a) committed by Defendants, as alleged in the Second and Third Claims for Relief, including but not limited to the copies of the Infringing

Works sold and the transmissions of false copyright management information through the ONIX metadata feed, in an amount of not less than $2,500 and not more than $25,000 per violation;

5. As prescribed and permitted under the DMCA and consistent with the remedial and deterrent policies of the DMCA, an award of statutory damages pursuant to 17 U.S.C. § 1203(c)(3)(B) for each violation of 17 U.S.C. § 1202(b) committed by Defendants, as alleged in the Fourth Claim for Relief, in an amount of not less than $2,500 and not more than $25,000 per violation;

6. Injunctive relief pursuant to 17 U.S.C. §§ 502 and 1203(b) enjoining Defendants, and all persons acting in concert or participation with Defendants, from providing or distributing false copyright management information, and from removing or altering copyright management information, in connection with the Works;

7. An award of costs, expenses, and reasonable attorneys' fees pursuant to 17 U.S.C. § 505, to the extent available under 17 U.S.C. § 412, and pursuant to 17 U.S.C. § 1203(b)(4) and (5);

8. An award of interest, including prejudgment interest, on any monetary relief awarded by the Court;

9. For trial by jury on all issues; and

10. Such other and further relief as the Court deems just and proper.

Respectfully submitted this 29th day of September, 2026.

*Attorney for Plaintiff*

/s/ Mark W. Ishman
Mark W. Ishman
N.C. State Bar No. 27908
ISHMAN LAW FIRM, P.C.

9660 Falls of Neuse Road, Box 138-350
Raleigh, North Carolina 27615
Telephone: (919) 468-3266
Email: mishman@ishmanlaw.com

**CERTIFICATE OF SERVICE**

I hereby certify that on this date the foregoing was filed via CM/ECF, which will provide notice to all counsel of record.

Date: September 29, 2026.

*Attorney for Plaintiff*

/s/ Mark W. Ishman
Mark W. Ishman
N.C. State Bar No. 27908
ISHMAN LAW FIRM, P.C.
9660 Falls of Neuse Road, Box 138-350
Raleigh, North Carolina 27615
Telephone: (919) 468-3266
Email: mishman@ishmanlaw.com